RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0033P (6th Cir.)
File Name: 03a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

No. 99-4099

LILLIAN PEBBLES MORRISON,
       *Plaintiff-Appellant,*

  *v.*

CIRCUIT CITY STORES, INC.,
       *Defendant-Appellee.*

No. 99-5897

MARK F. SHANKLE, SR.,
       *Plaintiff-Appellee,*

  *v.*

PEP BOYS — MANNY, MOE &
JACK, INC. et al.,
       *Defendants-Appellants.*

Nos. 99-4099/5897

Appeal from the United States District Courts
for the Southern District of Ohio at Cincinnati and the
Middle District of Tennessee at Nashville.
Nos. 99-00017; 98-00963—S. Arthur Spiegel,
John T. Nixon, District Judges.

Argued: March 20, 2002

1

Decided and Filed:  January 30, 2003

Before:  MARTIN, Chief Circuit Judge; BOGGS,
BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY,
and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Kelly Mulloy Myers, FREKING & BETZ,
Cincinnati, Ohio, Curtis L. Mack, McGUIRE WOODS LLP,
Atlanta, Georgia, for Appellants.  Rex Darrell Berry,
LIVINGSTON & MATTESICH, Sacramento, California,
Cyrus L. Booker, BAKER, DONELSON, BEARMAN &
CALDWELL, Nashville, Tennessee, for Appellees. Susan R.
Oxford, EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, D.C., for Amicus Curiae.
**ON BRIEF:**  Kelly Mulloy Myers, Randolph H. Freking,
FREKING & BETZ, Cincinnati, Ohio, Curtis L. Mack,
McGUIRE WOODS LLP, Atlanta, Georgia, for Appellants.
Rex Darrell Berry, LIVINGSTON & MATTESICH,
Sacramento, California, Cyrus L. Booker, BAKER,
DONELSON, BEARMAN & CALDWELL, Nashville,
Tennessee, John W. Fischer, DENLINGER, ROSENTHAL
& GREENBERG, Cincinnati, Ohio, for Appellees. Robert J.
Gregory, OFFICE OF THE GENERAL COUNSEL,
Washington, D.C., for Amicus Curiae.

MOORE, J., delivered the opinion of the court, in which
MARTIN, C. J., DAUGHTREY, COLE, CLAY, and
GILMAN, JJ., joined.  BATCHELDER, J. (pp. 55-63),
delivered a separate dissenting opinion, in which BOGGS, J.,
joined.

affords a sufficient basis for concluding that Randolph would
in fact have incurred substantial costs in the event her claim
went to arbitration.") (emphasis added); *see also*
Respondent's Brief at 34, *Green Tree*, 531 U.S. 79 (No. 99-
1235), 1999 U.S. Briefs 1235 (citing *Cole*, 105 F.3d at 1480
n.8, as well as other Court of Appeals cases, as evidence that
arbitration costs could be prohibitive).  I would find, as the
Supreme Court did in *Green Tree*, that the record is
insufficient to establish the likelihood that Morrison (or even
similarly situated litigants, if there were any reason to
consider them) would face prohibitive costs.

Shankle fares only a little better.  We know that he was a
mechanic and salesperson, but we do not even know his
salary. Shankle did provide evidence that the arbitrator would
charge $150 per hour.  But for the proposition that "the
typical employment discrimination arbitration involves
between fifteen and forty hours of arbitrator time," the
majority cites *Shankle v. B-G Maintenance Management of
Colorado, Inc.*, 163 F.3d 1230, 1234 n.5 (10th Cir. 1999),
which in turn—remarkably enough—cites the same old
footnote in *Cole*. *Ante*, at 43 (citing *Shankle*, 163 F.3d at
1234 n.5) (citing *Cole*, 105 F.3d at 1480 n.8).  At the very
least, Shankle should have cited estimates made by or about
arbitrations done under the AAA procedure.  I would find that
Shankle, like Morrison, has failed to carry his burden of
showing the likelihood of prohibitive costs.

estimate by the AAA . . . the average arbitrator fee was $700 per day." *Ante*, at 31. Morrison's brief, in turn, derives its information from a footnote in *Cole v. Burns Int'l Sec. Serv.*,105 F.3d 1465 (D.C. Cir. 1997), which says: "AAA cites $700 per day as the average arbitrator's fee. Kenneth May, *Labor Lawyers at ABA Session Debate Role of American Arbitration Association*, DAILY LAB. REP. (BNA) No. 31, at A-12 (Feb. 15, 1996)." *Id*. at 1480 n.8. But I have already noted that the plaintiff in *Green Tree* attempted to rely on this very article, and I would add that the Supreme Court explicitly found that it was unreliable, observing that "[t]he article contains a stray statement by an association executive that the average arbitral fee is $700 per day." 531 U.S. at 90 n.6. I think the majority errs in holding that Morrison satisfies her burden by relying on the same "stray statement" that Randolph attempted, in vain, to rely on before the Supreme Court.

Further, in establishing that "an average employment case incurred a total of $3,750 to $14,000 in arbitration expenses," *ante*, at 31, the majority again relies on Morrison's brief, which again relies on the same footnote in *Cole*. *See* Appellant's Brief at 13 (citing *Cole*, 105 F.3d at 1480 n.8). The relevant portion of the *Cole* footnote provides that

> CPR Institute for Dispute Resolution estimates arbitrators' fees of $250–$350 per hour and 15–40 hours of arbitrator time in a typical employment case, for total arbitrators' fees of $3,750 to $14,000 in an "average" case. *See* CPR INST. FOR DISPUTE RESOLUTION, EMPLOYMENT ADR: A DISPUTE RESOLUTION PROGRAM FOR CORPORATE EMPLOYERS I-13 (1995).

105 F.3d at 1480 n.8. In my opinion, this remains too speculative: an estimate from a document published eight years ago, as cited by a different Court of Appeals. *See Green Tree*, 531 U.S. at 90 n.6 ("Randolph's brief lists fees incurred in cases involving other arbitrations *as reflected in opinions of other Courts of Appeals* . . . None of this information

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. These cases, consolidated for purposes of en banc review, involve the interaction in the employment context of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, with federal anti-discrimination laws, such as Title VII of the Civil Rights Act of 1964. Both of the employees involved, Lillian Pebbles Morrison and Mark F. Shankle, were required to sign arbitration agreements as conditions of their employment, Morrison with Circuit City Stores, Inc. ("Circuit City"), and Shankle with the Pep Boys-Manny, Moe & Jack, Inc. ("Pep Boys"). Morrison and Shankle both sought to sue their former employers in court for discrimination after termination. In Morrison's case, the district court held that the arbitration agreement was enforceable and thus stayed Morrison's lawsuit pending arbitration. In Shankle's case, the district court held the agreement unenforceable and stayed arbitration pending litigation. We ordered a consolidated en banc hearing to address the important issues presented in these cases regarding mandatory arbitration agreements in the employment context.

The proper resolution of these appeals requires that we carefully reconcile the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983), with the important rights created and protected by federal civil rights legislation. In the past, many have viewed mandatory arbitration in the employment context and the goals of civil rights legislation as irreconcilable, with the former understood as a means for employers to evade the purposes of the latter. The Supreme Court, however, has repeatedly "rejected generalized attacks on arbitration that rest on suspicion of arbitration as a method of weakening the protections afforded in the substantive law." *Green Tree Fin. Corp.-Ala. v.*

*Randolph*, 531 U.S. 79, 89-90 (2000) (quotation omitted). *See also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) (holding that mandatory arbitration agreements in the employment context fall under the FAA).

Instead, the Supreme Court has emphasized that "federal statutory claims may be the subject of arbitration agreements . . . enforceable pursuant to the FAA because the agreement only determines the choice of forum." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 n.10 (2002). Thus, under the correct reconciliation of the sometimes-perceived conflict between arbitration agreements in the employment context and federal anti-discrimination laws, the choice to arbitrate statutory claims will change only the forum of decision and not the substantive protections afforded by the statutes in question. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).

The following resolution of the cases before us attempts and, we believe, achieves such a reconciliation of the liberal policy favoring arbitration and the important goals of federal anti-discrimination statutes. Part I of this opinion provides the factual background of the two cases consolidated in this appeal. Part II addresses the enforceability of cost-splitting provisions in mandatory arbitration agreements subjecting statutory claims to an arbitral forum. After rejecting competing standards in section II.A., we provide in section II.B. a standard for determining whether a cost-splitting provision in an arbitration agreement undermines the purposes of federal anti-discrimination legislation. Consistent with the Supreme Court's holdings in *Green Tree* and *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), we adopt a "case-by-case" standard that protects plaintiffs' access to an effective forum, judicial or arbitral, for the vindication of their statutory claims.

went to arbitration." *Id*. Later, the Court pointed out that it was not deciding the question of "[h]ow detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence," though it concluded that Randolph had not met that burden. *Id*. at 92.

In the present case, the majority derives its information about the costs facing Morrison from two sources. First, it presents figures from a study—not found in the record of this case, and not even released until after oral argument—published by Public Citizen, a consumer advocacy organization. This study's findings are based on costs and estimates published by three major arbitration providers. Public Citizen does not attempt to hide the fact that it is marshaling evidence to show why cost-splitting provisions are a bad idea. From its study we learn that for claims of $60,000 to $80,000, the costs of arbitration are often much greater than those of litigation. This may be so, but I do not see how this non-specific, extra-record evidence—which Circuit City has had no opportunity to refute—satisfies Morrison's burden. Morrison's complaint does not specify how much she is claiming, we have no idea how Circuit City's arbitration fees stack up against the general figures listed in the study, and *Green Tree* says nothing about comparing the prospective costs of arbitration vs. litigation. To paraphrase *Green Tree*, I would find that Morrison has "plainly failed to make any factual showing that the American Arbitration Association [or either of the other two organizations that Public Citizen's study relies on] would conduct the arbitration, or that, if [they] did, she would be charged the filing fee or arbitrator's fee that [the study] identified." 531 U.S. at 90 n.6. On the contrary, "[t]hese unsupported statements provide no basis on which to ascertain *the actual costs and fees* to which she would be subject in arbitration." *Id*. (emphasis added).

The majority's second source is Morrison's brief, which the majority cites for the proposition that according to "a recent

effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. As the Court of Appeals recognized, "we lack . . . information about how claimants fare under Green Tree's arbitration clause." 178 F.3d, at 1158. The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

531 U.S. at 90–91 (footnote omitted). As a footnote within this passage acknowledges, Randolph had made some attempt to set forth evidence of the costs she faced: she asserted an average filing fee, though her source—informational material from the AAA—did not discuss the amount of filing fees; she relied on an article—Kenneth May, *Labor Lawyers at ABA Session Debate Role of American Arbitration Association*, DAILY LAB. REP. (BNA) No. 31, at A-12 (Feb. 15, 1996)—for the proposition that the average arbitrator's fee in an AAA arbitration is $700 per day; and she cited fee estimates listed in various Court of Appeals decisions. 531 U.S. at 90 n.6. Concerning the two AAA estimates Randolph submitted, the Court concluded that

> Randolph plainly failed to make any factual showing that the American Arbitration Association would conduct the arbitration, or that, if it did, she would be charged the filing fee or arbitrator's fee that she identified. These unsupported statements provide no basis on which to ascertain the actual costs and fees to which she would be subject in arbitration.

*Id*. The Court also found Randolph's citations to Court of Appeals decisions inadequate: "None of this information affords a sufficient basis for concluding that Randolph would in fact have incurred substantial costs in the event her claim

Part III addresses Morrison's claims on appeal. After setting out the standard of review in section III.A. and reviewing various state-law contract arguments in section III.B., we hold in section III.C. that the cost-splitting provision in the Circuit City arbitration agreement is not enforceable in the present case. In section III.D., we further hold that provisions in arbitration agreements that limit the remedies available in the arbitral forum, compared to those remedies available in the judicial forum, are also unenforceable. Having held that both the cost-splitting provision and the limitation-of-remedies provision in the Circuit City arbitration agreement are unenforceable, we address the severability of the offending provisions in Morrison's case in section III.E. Given our conclusion that these provisions are severable, we **AFFIRM** the district court's dismissal of Morrison's claims and its order compelling arbitration, although for reasons different from those provided by the district court.

Part IV addresses Pep Boys' arguments on appeal. In section IV.B., we apply the standard provided in section II.B. and hold that the cost-splitting provision in Pep Boys' arbitration agreement is also unenforceable. Section IV.C. holds that the remainder of the Pep Boys arbitration agreement is enforceable under Tennessee state law and that Shankle's proper remedy for the American Arbitration Association's (AAA's) failure to abide by the terms of the arbitration agreement is to seek a court order, pursuant to § 4 of the FAA, mandating compliance with the terms of the agreement. For these reasons, we **AFFIRM** the district court's order in Shankle's case in part, **REVERSE** in part, and **REMAND** for proceedings consistent with this opinion.

## I. BACKGROUND

### A. Morrison

On July 10, 1995, Plaintiff-Appellant Morrison, an African-American female with a bachelor's degree in engineering

from the U. S. Air Force Academy and a master's degree in administration from Central Michigan University, submitted an application for a managerial position at a Circuit City store in Cincinnati, Ohio. As part of the application process, Morrison was required to sign a document entitled "Dispute Resolution Agreement." This document contained an arbitration clause that required resolution of all disputes or controversies arising out of employment with Circuit City in an arbitral forum. The application provided that Circuit City would not consider any application for employment unless the arbitration agreement was signed, that all applicants were required to arbitrate any legal dispute relating to their employment with Circuit City, including all state and federal statutory claims, contract claims, and tort claims, that all arbitrations would occur before a neutral arbitrator, and that all such arbitrations would be final and binding. Applicants could withdraw their consent to the arbitration agreement within three days of signing the application, but such action would also constitute withdrawal of their application for employment at Circuit City.

The Circuit City arbitration agreement also provided that all arbitrations were to proceed according to the "Circuit City Dispute Resolution Rules and Procedures." These rules and procedures addressed a variety of arbitral matters, including the time limitations for filing a request for arbitration, the limitation on remedies available to plaintiffs in the arbitral forum, filing fees, the payment of arbitration costs, discovery, and attorney fees. The relevant terms of the rules and procedures in the agreement entered into by Morrison are as follows.[1] Rule 4 requires an associate/employee to pay a filing fee of $75 to initiate arbitration and to submit an arbitration request form within one year of "the date on which the Associate knew, or through reasonable diligence should

---

[1]Circuit City reserved the right to modify the rules of the arbitration agreement, and it has modified one of the rules at issue in the present case. This modification is discussed in section III.D. *infra*.

similarly situated potential litigants, "it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute." *Ante*, at 21. But the majority opinion also says, a few paragraphs further on, that the detailed socio-economic and arbitration-cost-versus-litigation-cost analyses that the court must undertake will yield different results in different cases. If the court concludes that the provision is unenforceable as to the potential litigant who raised the particular challenge, are all other similarly situated potential litigants relieved from the burden imposed by *Green Tree*? Some other potential litigants? Is the provision simply to be struck down? Or struck down as to some parties to the agreement?

I must further respectfully dissent from the majority opinion's conclusion that the cost-splitting provisions in Morrison's agreement with Circuit City and Shankle's agreement with Pep Boys are unenforceable. I would hold that we lack sufficient information about either Morrison or Shankle to determine adequately—in a manner that comports with *Green Tree*—whether they can afford the costs, or how much they can afford.

Turning first to Morrison, we know that she was a manager and made $54,060 per year. We do not know the actual arbitration costs, if any, that were imposed on her, but we do know that the agreement provided that she could be required to pay only a maximum of 3% of her annual salary, or $1,622. Only if she did not pay this sum within 90 days of the arbitrator's award could she be responsible for up to one-half of the costs of arbitration. But the majority's method of determining Morrison's potential costs runs afoul of *Green Tree*.

The *Green Tree* Court, in discussing Randolph's ability to pay, observed that

[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from

principle that "the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." 500 U.S. at 28 (citation omitted). *Gilmer* spoke in terms of the individual litigant, and implied neither a need nor a requirement for a reviewing court to look beyond him.

Finally, the case-by-case approach that the majority eschews is not simply the approach "advocated in *Bradford*," as the majority puts it, but is the approach compelled by the Supreme Court's decision in *Green Tree*. Nothing in *Green Tree* authorizes the majority's novel requirement that where one party to an agreement to arbitrate challenges the agreement's cost-splitting provision, the federal court—in the interest of advancing the "broader social purposes" of the federal anti-discrimination statutes under which the claim to be arbitrated arises—must decide the enforceability of the provision by "addressing the effect of arbitration costs on a class" of similarly situated potential litigants. *Ante*, at 22. Indeed, the *Green Tree* Court made it very clear that the court reviewing such a challenge must determine whether the particular challenger has demonstrated that she would incur prohibitive arbitration costs in her particular arbitration proceeding, costs that certainly would be greatly influenced by both the kind and number of claims to be arbitrated. The majority opinion here, however, explicitly requires—contrary to *Green Tree*'s directive—that the costs to be considered are those that are "average or typical."

The majority opinion creates the anomalous likelihood that a district court could scrutinize, and perhaps strike down, a cost-splitting provision where the particular worker was fully able to pay the costs of litigation. It also creates a new layer of litigation that goes far beyond what is necessary to determine whether the cost-splitting provision of an agreement to arbitrate is enforceable against a particular challenger of that provision, and in doing so, raises questions for which it provides no answers. For example, the majority opinion directs that if the reviewing court finds that the cost-splitting provision would deter a substantial number of

have known, of facts giving rise to the Associate's claim" to avoid waiver of such claim. Joint Appendix ("J.A.") at 129. Rule 5 provides that "Circuit City and the Associate shall participate equally in the selection of an Arbitrator to decide the arbitration" by choosing from among a panel of seven neutral arbitrators provided by Resolute Systems, Inc., or another arbitration service. J.A. at 130.

Pursuant to Rule 13, Circuit City is required to advance all costs for the arbitration (except for the $75 filing fee), but each party is required to pay one-half of the costs of arbitration following the issuance of an arbitration award, unless the arbitrator decides to use her discretionary power to require the losing party to pay all arbitration costs. Such costs include "the daily or hourly fees and expenses (including travel) of the Arbitrator who decides the case, filing or administrative fees charged by the Arbitration Service, the cost of a reporter [to] transcribe[] the proceeding, and expenses of renting a room in which the arbitration is held," as well as incidental costs such as "photocopying or the costs of producing witnesses or proof." J.A. at 134. Rule 13 further provides that all arbitration costs must be paid within ninety calendar days of the issuance of the arbitration award. In addition, that rule provides that, if an employee is able to pay her share of the arbitration costs within this ninety day period, her costs (not including attorney fees) are then limited to the greater of either five hundred dollars or three percent of her most recent annual compensation. An employee who is not able to arrange to pay this amount within ninety days of the award's issuance, however, must pay her entire share of the costs. Circuit City also reserves the right to deduct up to five percent of the employee's compensation per pay period to satisfy any outstanding obligation.

In addition to the costs of arbitration, Rule 13 also states that each party is responsible for its own attorney fees. The rule, however, also gives the arbitrator discretion to award reasonable attorney fees to the employee if she prevails at the arbitration hearing or to Circuit City if the arbitrator finds

"that the Associate's claim was frivolous, or presented in bad faith or for an improper purpose, such as to harass the Company." J.A. at 135.

Rule 8 addresses discovery procedures for arbitration, entitling every claimant to documents in her personnel file but limiting each party to one set of twenty interrogatories, including subparts, and three depositions. Any additional discovery would be permitted only upon a showing of substantial need, and all discovery would have to be completed within ninety calendar days after the selection of an arbitrator.

Rule 14 lists the remedies that an arbitrator may award an associate, including injunctive relief, back pay, front pay, compensatory damages, and punitive damages. Rule 14 also places limits on the amount of monetary damages that may be awarded, allowing for twelve months of back pay, starting "from the point at which the Associate knew or should have known of the events giving rise to the alleged violation," and allowing any back pay award to be "reduced by interim earnings, public or private benefits received, and amounts that could have been received with reasonable diligence." J.A. at 135. Additionally, Rule 14 states that an arbitrator may award only up to twenty-four months of front pay and limits any award of punitive damages to the greater of $5,000 or an amount equal to the sum of the front and back pay awards.

Finally, Rule 12 requires the arbitrator to present a written copy of the award within twenty-one calendar days after receipt of post-hearing briefs, if any, and Rule 19 provides that "Circuit City may alter or terminate the Agreement and these Dispute Resolution Rules and Procedures on December 31st of any year upon giving 30 calendar days written notice to Associates." J.A. at 136.

Morrison began her employment at Circuit City on or about December 1, 1995. Two years later, on December 12, 1997, she was terminated. Morrison alleges that her termination

will be deterred, but whether this plaintiff can afford the costs.

Not only is the majority opinion's pre-arbitration layer of litigation unnecessary, it is also without foundation in the cases that the majority cites to support it. The majority declines to follow an actual case-by-case approach to determining the possible "chilling effect" of an agreement's cost-splitting provision—an approach the majority attributes to *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549 (4th Cir. 2001). Instead, the majority looks to *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), stating that

[t]his difference in approach is premised on *Gilmer*, which held that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." As *Gilmer* makes clear, federal anti-discrimination statutes play both a remedial and deterrent role. Although the former role is largely a matter of the rights of particular aggrieved individuals, the latter is a question of "broader social purposes." The deterrent function of the laws in question is, in part, that employers who engage in discriminatory practices are aware that they may incur liability in more than one case. If, however, a cost-splitting provision would deter a substantial number of potential litigants, then that provision undermines this deterrent effect of the anti-discrimination statutes. Thus, in order to protect the statutory rights at issue, the reviewing court must look to more than just the interests and conduct of a particular plaintiff.

*Ante*, at 20 (citations omitted). Of course, if the cost-splitting provision is unenforceable against any plaintiff who makes the required showing that he or she cannot pay those costs, then the deterrent function of the laws in question is well-fulfilled. *Gilmer* merely reiterated the importance of the

appropriate nor necessary. Whether a party claiming an inability to comply with the cost-splitting provision of an agreement to arbitrate chooses to raise the matter prior to arbitration in a legal action challenging the agreement or in a post-arbitration proceeding for judicial review,[1] the bottom line will be the same: if the costs are likely to exceed the party's ability to pay them, or if the actual costs incurred exceed her ability to pay them, she cannot be required to pay them. The majority is correct in noting that in the past, plaintiffs have found themselves in a sort of "Catch-22" when litigating cost-splitting provisions after the arbitration: the potential imposition of costs clearly did not deter this plaintiff, so why should the court find that the costs were prohibitively high? But *Green Tree* solved this problem by establishing that if a plaintiff cannot afford the likely costs (in a pre-arbitration determination) or actually-imposed costs (in a post-arbitration determination), then the cost-splitting provision cannot be enforced against that plaintiff. Once this is understood, deterrence is no longer an issue, and the "Catch-22" disappears: plaintiffs can approach arbitration with confidence—regardless of whether they choose to litigate the issue before the arbitration, or whether they find it more convenient or cost-effective to do so afterwards—knowing that they will not have to pay if they cannot afford it. The district court's job is to determine not whether this or other similarly situated plaintiffs have been or

---

[1]As my statement in the text makes clear, I think that *Green Tree* allows for either a pre- or a post-arbitration determination. In *Green Tree*, after all, the Supreme Court considered a pre-arbitration challenge to cost imposition, and the Court indicated that the litigant's deficiency was not that she had brought suit too early, but that she had failed to carry her burden of showing the "likelihood" that the costs imposed would be prohibitive. 531 U.S. at 92. On the other hand, the Court did not rule out the possibility that review of costs could be appropriate *post hoc* as well.

Consequently, the majority is incorrect in stating that "the dissent favors a post-arbitration evaluation of parties' ability to pay the costs." *See ante*, at 17. My quarrel is not with the proposition of a pre-arbitration determination, but with the elaborate scheme the majority creates.

was the result of race and sex discrimination. She filed this lawsuit on December 11, 1998, in Ohio state court, alleging federal and state claims of race and sex discrimination, a violation of Ohio public policy, and a promissory estoppel claim. Circuit City removed the case to federal court and then moved to compel arbitration and to dismiss Morrison's claims. The district court granted Circuit City's motion, rejecting Morrison's arguments that the arbitration agreement was unenforceable under federal and state law.

Morrison's appeal followed. Because the arbitration was not stayed below, however, in April 2000, Morrison and Circuit City participated in an arbitration hearing on her claims, and on July 14, 2000, the arbitrator issued an award. Neither Morrison nor Circuit City has sought to vacate, modify, or correct the award, and the period in which judicial review of the arbitrator's award might have been sought has expired. For this reason, Circuit City moved this court to dismiss this appeal as moot. We denied that motion on January 17, 2002.[2]

The case was originally argued before a hearing panel on January 26, 2001. A majority of the active judges of the court voted to rehear the case en banc, the court issued an order for rehearing en banc on October 17, 2001, and the consolidated

---

[2]Even though Morrison's case has been arbitrated, the claims she raises in this appeal are not moot because this court could still grant effectual relief in the present case, if we were to determine that the arbitration agreement was in fact unenforceable and thus arbitration should never have taken place. *Cf. Church of Scientology v. United States*, 506 U.S. 9 (1992) (holding that appeal of IRS summons was not moot even though subject of summons had already turned over the evidence at issue because court could still order some partial relief). As discussed *infra*, however, we ultimately hold that, although the challenged provisions are unenforceable, they are also severable from the agreement. Given that these provisions were not enforced in Morrison's arbitration, the arbitration proceeded as though the provisions were in fact unenforceable and severed. For this reason, we affirm the district court's order on these grounds.

rehearing with *Shankle v. Pep Boys-Manny, Moe & Jack, Inc.*, No. 99-5897, was held on March 20, 2002.

**B. Shankle**

Plaintiff-Appellee Shankle was employed at a Pep Boys store in Nashville, Tennessee, from January 25, 1997, through May 21, 1998. Shankle executed a "Mutual Agreement to Arbitrate Claims" as a condition of his employment with Pep Boys. The relevant provisions of that agreement state:

Arbitration Procedures
The Company and I agree that, except as provided in this Agreement, any arbitration shall be in accordance with the then-current Model Employment Arbitration Procedures of the American Arbitration Association ("AAA") before an arbitrator who is licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"). The arbitration shall take place in or near the city in which I am or was last employed by the Company.

The Arbitrator shall be selected as follows. The AAA shall give each party a list of 11 arbitrators drawn from its panel of labor-management dispute arbitrators. Each party may strike all names on the list it deems unacceptable. If only one common name remains on the list of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternatively until only one remains. The party who did not initiate the claim shall strike first. If no common name remains on the list of all parties, the AAA shall furnish an additional list or lists until the Arbitrator is selected.

———————

**DISSENT**

———————

ALICE M. BATCHELDER, Circuit Judge, dissent. I concur in much of the majority opinion. But I must respectfully dissent from the majority's creation of a complex new field of litigation in order to determine the enforceability of a cost-splitting provision in an agreement to arbitrate. I dissent as well from the majority opinion's conclusion that the cost-splitting provisions in both Morrison's and Shankle's agreements are unenforceable.

Recognizing that high arbitration costs "could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum," *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000), the Supreme Court in *Green Tree* held that the mere risk that Randolph would have to pay those costs was not enough to justify the invalidation of the arbitration agreement. Rather, the Court held, "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id*. at 92. I believe that it follows ineluctably from *Green Tree* that where one party to an agreement to arbitrate containing a cost-splitting provision demonstrates that the likely costs of arbitration will be large, and she cannot afford to pay her share of those costs, either the agreement to arbitrate must be held invalid or the cost-splitting provision, if it is severable, must be held unenforceable.

If the cost-splitting provision cannot be enforced against such a party, it can hardly serve to deter her from seeking to vindicate her federal statutory rights in the arbitral forum or prevent her from being able to do so effectively. That being the case, the majority opinion's complicated pre-arbitration quasi-class action litigation scheme seems to me to be neither

In order to avoid the inconsistent procedures that arose in the stayed arbitration, Shankle may move the district court for such an order. If the AAA fails to comply with that order, Shankle may return to the district court after the arbitration is completed and move that the court, pursuant to 9 U.S.C. § 10(a)(4),[23] vacate the award on that basis.

### V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court order in Morrison's case, on different grounds than those relied upon by the district court, and **AFFIRM** in part, **REVERSE** in part, and **REMAND** Shankle's case for further proceedings consistent with this opinion.

---

[23]That provision states that the district court "may make an order vacating the award upon the application of any party to the arbitration . . . [w]here the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).

Arbitration Fees and Costs
The Company and I shall equally share the costs of the Arbitrator's fee, in the amount and manner determined by the Arbitrator, ten days before the first day of the hearing. Each party shall pay for its own costs and attorneys' fees, if any. However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable fees to the prevailing party.

After Shankle quit his job with Pep Boys, he consulted a law firm with respect to obtaining severance pay; when this law firm contacted Pep Boys, the company informed the law firm that Shankle would have to arbitrate claims against it, pursuant to the arbitration agreement. Based on this information, Shankle initiated arbitration proceedings on August 4, 1998. Then, on September 3, 1998, Shankle retained new counsel; apparently on the advice of his new counsel, Shankle filed suit in state court, alleging, *inter alia*, violations of Title VII, and attempted to withdraw from the arbitration proceedings that he had earlier initiated.

Pep Boys removed the case to federal court and then moved, on November 6, 1998, to stay the litigation pending arbitration and to stay discovery. Pep Boys argued that Shankle's lawsuit should be stayed because of the arbitration agreement, which Pep Boys argued required Shankle to pursue his claims through mandatory arbitration. In its supporting memorandum, Pep Boys also argued that the cost-splitting provision in the arbitration agreement was enforceable.

The district court denied Pep Boys' motions and granted Shankle's motion to stay arbitration on June 1, 1999. The district court held that the cost-splitting provision in the arbitration agreement was invalid and unenforceable. The district court further held that the remainder of the agreement did not constitute a valid and enforceable contract under

Tennessee state law, because discrepancies between the procedures actually being followed in the AAA proceedings and the procedures described in the arbitration agreement demonstrated that "there was no meeting of the minds as to the procedures to be followed during the arbitration." J.A. at 30. The district court pointed to a number of discrepancies between the AAA procedures and the arbitration agreement. The AAA, as the entity conducting the arbitration, for example, was following its own procedures, although the agreement specified that the procedures described in it would be followed. Additionally, there were irregularities in the selection of the arbitrator and differences in the availability of discovery and evidentiary rules under the two sets of procedures.

Pep Boys filed a timely notice of appeal, and the case was argued on June 16, 2000, before a hearing panel. A majority of the active judges of the court voted for rehearing en banc. The court issued an order for rehearing en banc on October 17, 2001, and the consolidated rehearing with *Morrison v. Circuit City Stores, Inc.*, No. 99-4099, was held on March 20, 2002. Unlike in Morrison's case, arbitration was stayed, and thus the arbitrator never issued a decision or an award in Shankle's case.

## II. COST-SPLITTING[3]

Both Morrison and Shankle argue on appeal that the cost-splitting provisions in the arbitration agreements at issue in their respective cases have the effect of denying them effective fora for the vindication of their statutory rights. The Supreme Court has made clear that statutory rights, such as

---

**3**This opinion uses the term "cost-splitting," rather than "cost-sharing" or "fee-splitting," to describe the arrangement by which the parties to an arbitration bear the costs of an arbitration equally. Some arbitration agreements also provide for "cost-shifting," an arrangement by which the arbitrator may determine that one of the parties should bear all or most of the costs of the arbitration.

destroys the purpose of the contract permanently. The first illustration from the Restatement (Second) of Contracts provides a good example: There, A and B made a contract under which B was to pay A $1,000 for the use of A's window on January 10 to view a parade scheduled for that day. Because of an important public official's illness, the parade was canceled. B refused to use the window or pay the $1,000. In that case B's duty to pay $1,000 was discharged, and B was not liable to A for breach of contract. Restatement (Second) of Contracts § 265 cmt. a, illus. 1 (1979).

The contract in the Restatement illustration was time-sensitive, and its purpose was irrevocably destroyed by the official's illness. In our case, however, the purpose of the arbitration agreement has been "nearly destroyed" only for the moment. Aside from the severable cost-splitting provision, the agreement is faulty only as it has been applied by the AAA, a third party. In light of the strong federal policy in favor of arbitrability, we conclude that the arbitration should proceed according to the remaining terms of the arbitration agreement. For this reason, we reverse the district court with respect to the enforceability of the remaining terms of the Pep Boys arbitration agreement and remand Shankle's case to the district court for further proceedings consistent with this opinion. The district court is instructed to grant Pep Boys' motion for a stay of litigation and discovery pending arbitration.

On remand, Shankle has the ability to secure a court order mandating that the terms of the Pep Boys arbitration agreement be followed in subsequent arbitration proceedings. Under the FAA, district courts have the authority, when moved by a party, to compel arbitration according to the terms of an arbitration agreement. Section 4 of the FAA states, in relevant part, "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [the] district court . . . for an order directing that such arbitration proceed *in the manner provided for in such agreement*" (emphasis added).

rules found in the agreement when there was a conflict between the two.

The selection of an arbitrator is clearly at the heart of any arbitration agreement. In entering into this agreement with Pep Boys, Shankle bargained for a process by which he and Pep Boys would strike unacceptable names from AAA-provided lists until a commonly accepted arbitrator remained. Shankle did not expect, nor did he have reason to expect, that the AAA would pre-empt the process by imposing its choice after the parties rejected the first slate of candidates. Because of the provisions of the arbitration agreement adopting the Federal Rules of Evidence and Civil Procedure, he expected that those rules would govern the arbitration of any dispute between him and Pep Boys. Finally, the arbitration agreement's supremacy clause gave Shankle every reason to expect that it would actually dictate the way an arbitration would operate.

As discussed at length *supra*, arbitration procedures must afford litigants an effective channel for pursuing their statutory claims. *Gilmer*, 500 U.S. at 28. Allowing an arbitration to go forward under conditions such as these, however, would prevent Shankle and other employees from effectively vindicating their statutory rights in the arbitral forum. Shankle did not get what he bargained for when he entered into the arbitration agreement with Pep Boys. What he got "nearly destroyed the . . . purpose of the contract," *Haun*, 690 S.W.2d at 871, which was to provide Shankle with an arbitral forum that would allow him to pursue his statutory rights. To allow a third party, especially a third party charged with conducting the arbitration according to the terms of the arbitration agreement, to ignore the terms of the agreement at issue would undermine confidence in the integrity of arbitration as a legitimate forum for the vindication of public claims.

Still, this case is slightly different from the classic frustration-of-purpose case, wherein a supervening event

those created by Title VII, may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights. "So long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (quotation omitted). If, then, the splitting or sharing of the costs of the arbitral forum under a particular arbitration agreement effectively prevents the vindication of a plaintiff's statutory rights, those rights cannot be subject to mandatory arbitration under that agreement. *See, e.g.*, *Williams v. Cigna Fin. Advisors, Inc.*, 197 F.3d 752, 763 (5th Cir. 1999) (holding that *Gilmer* "plainly indicates that an arbitral cost allocation scheme may not be used to prevent effective vindication of federal statutory claims"), *cert. denied*, 529 U.S. 1099 (2000); *Shankle v. B-G Maint. Mgmt. of Col., Inc.*, 163 F.3d 1230, 1234 (10th Cir. 1999) ("[A]n arbitration agreement that prohibits the use of the judicial forum as a means of resolving statutory claims must also provide for an effective and accessible alternative forum.").

The arbitration of statutory claims must be accessible to potential litigants as well as adequate to protect the rights in question so that arbitration, like the judicial resolution of disputes, will "further broader social purposes." *Gilmer*, 500 U.S. at 28. To put the matter in a slightly different way, employers should not be permitted to draft arbitration agreements that deter a substantial number of potential litigants from seeking any forum for the vindication of their rights. To allow this would fatally undermine the federal anti-discrimination statutes, as it would enable employers to evade the requirements of federal law altogether.

Although the Tenth,[4] Eleventh,[5] and D.C.[6] Circuits have suggested that such cost-splitting provisions *per se* deny litigants an effective forum for the vindication of their statutory rights, most courts, including this one,[7] that have addressed this question have held that this issue must be decided on a case-by-case basis.  In *Green Tree Financial*

---

[4] *See Shankle v. B-G Maint. Mgmt. of Col., Inc.*, 163 F.3d 1230, 1235 (10th Cir. 1999) (holding that arbitration agreement requiring litigant to pay one-half of arbitration costs "failed to provide an accessible forum in which [litigant] could resolve his statutory rights").  *Shankle* could also be interpreted as employing a case-by-case approach, however, with the Tenth Circuit taking a significantly different approach to the case-by-case approach than other circuits.  *See Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 555 (4th Cir. 2001) ("Notably, although *Shankle* found that the fee-splitting provision rendered the arbitration agreement unenforceable, it framed its analysis in terms of the complaining party's actual inability to afford the arbitration costs and fees.").

[5] *See Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) (holding that "steep" costs, at least, constitute "a legitimate basis for a conclusion that the clause does not comport with statutory policy").

[6] *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1481 (D.C. 1997) ("[W]e hold that an arbitrator's compensation and expenses must be paid by the employer alone."); *see also id.* at 1484 ("[I]t is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court."); *id.* at 1485 ("In sum, we hold that Cole could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses.").  It should be noted, however, that the *Cole* court interpreted the arbitration agreement at issue as not requiring Cole to pay any arbitration fees, and thus it held that the agreement, so construed, was enforceable.  *See id.*

[7] *See Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 492 (6th Cir. 2001) ("As to the potentially burdensome costs of arbitration, the party resisting arbitration has the burden of showing the likelihood that arbitration would be prohibitively expensive.") (quotation omitted), *cert. denied*, – U.S. –, 122 S. Ct. 1436 (2002).

---

Contrary to Shankle's assertions, ascribing knowledge of the AAA's expected procedures to Pep Boys does not seem realistic.  To prevail on this claim, Shankle would have to produce evidence that the AAA had a practice of ignoring specific terms of arbitration agreements or that the AAA planned to ignore the agreement in this case.  Shankle has not done so.  Therefore, this argument fails.

Second, Shankle asserts that these discrepancies constitute a material alteration of the agreement and render it unenforceable.  His argument would be better described, however, as a frustration-of-commercial-purpose argument.  That doctrine, recognized by the Tennessee Supreme Court in *North American Capital Corp. v. McCants*, 510 S.W.2d 901 (Tenn. 1974), was further elaborated by *Haun v. King*, 690 S.W.2d 869, 871-72 (Tenn. Ct. App. 1984):

> [I]f the happening of an event, not foreseen by the parties to the contract and neither caused by nor under the control of either party, has destroyed or nearly destroyed either the value of performance or the object or purpose of the contract, then the parties are excused from further performance.   The *McCants* court stated that the "supervening event" must be "wholly outside the contemplation of the parties" but, if such frustrating event was reasonably foreseeable, the doctrine is not a defense.  The doctrine is predicated on the premise of giving relief where the parties could not provide themselves, by the provisions of the contract, against the happening of the supervening event.

In the present case, the record does not indicate that the parties could have foreseen that the AAA would not abide by the rules of the arbitration agreement, and neither party was in a position to control the AAA's behavior.  The question is whether the AAA destroyed or nearly destroyed the purpose of the contract when it applied its own procedures for selecting an arbitrator, indicated that it intended to apply its own procedural rules, and gave its own rules primacy over the

The district court pointed to several inconsistencies between the procedures spelled out in the Pep Boys arbitration agreement and the procedures being followed by the AAA. First, the AAA did not follow the agreed-upon procedures for selecting an arbitrator. Although the Pep Boys arbitration agreement requires that the parties be given a list of eleven arbitrators and that the arbitrator be licensed to practice law in Tennessee, the AAA gave the parties a list of ten individuals, only four of whom were so licensed. The Pep Boys arbitration agreement also provides that if the list is unacceptable to the parties, the AAA must furnish additional lists until an arbitrator is chosen. When Shankle and Pep Boys found the first list unacceptable, however, the AAA applied its own procedures and appointed an arbitrator without the submission of an additional list. Second, the arbitration agreement provides that the Federal Rules of Evidence and the Federal Rules of Civil Procedure will be applied by the arbitrator, but the AAA does not apply these federal rules and has indicated that it intends to apply its own rules. Third, the arbitration agreement provides that its terms should apply if any of its provisions conflict with AAA rules, but the AAA rules provide that "[i]f a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." J.A. at 89.

Based on these inconsistencies, Shankle continues to argue that he is not getting the arbitration he agreed to when he signed the arbitration agreement. He contends that the agreement is thus void for two reasons. First, he contends that Pep Boys misrepresented in the arbitration agreement that any arbitration would be carried out in accordance with the terms of the agreement and that Pep Boys knew or should have known that the AAA would not follow the agreement. Therefore, he argues that there was no meeting of the minds with respect to the procedures to be used by an arbitrator under the arbitration agreement.

*Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), the Supreme Court adopted a case-by-case approach to determining whether a cost-splitting provision in an arbitration agreement denies potential litigants the opportunity to vindicate their statutory rights. On this point, the Court commented:

It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, [the record] contains hardly any information on the matter. As the [Eleventh Circuit] recognized, "we lack . . . information about how claimants fare under Green Tree's arbitration clause." 178 F.3d, at 1158. The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

To invalidate the agreement on that basis would undermine the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital*, 460 U.S., at 24, 103 S.Ct. 927. It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. See *Gilmer*, *supra*, at 26, 111 S.Ct. 1647; *McMahon*, *supra*, at 227, 107 S.Ct. 2332. . . . [W]here, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden. How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss; for in this case . . . there [was no] timely showing at all on the point.

*Id.* at 91-92 (footnote omitted).

We believe that the following propositions of law can be derived from *Green Tree*. First, in some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum. Under *Gilmer*, the arbitral forum must provide litigants with an effective substitute for the judicial forum; if the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum. Second, where that prospect deters potential litigants, the arbitration agreement, or, at minimum, the cost-splitting provision contained within it, is unenforceable under *Gilmer*. Third, the burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

However, *Green Tree* does not provide us with a standard for "[h]ow detailed the showing of prohibitive expenses must be" to support the conclusion that the provision, at minimum, is unenforceable. In that case, of course, the plaintiff had relied solely on the arbitration agreement's silence on the allocation of arbitration costs, and thus the risk of incurring such prohibitive costs was highly speculative, indeed. In the cases before us, however, the arbitration agreements explicitly provide for cost-splitting. Thus, we must determine the appropriate standard for determining whether a cost-splitting provision contained in an arbitration agreement is invalid.

The Fourth Circuit has posited such a standard. In *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556 (4th Cir. 2001), that court set forth the following test:

> [T]he appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the

precedents.[22] *See also Giordano*, 2001 WL 484360, at *6 (holding that cost-splitting provision in Pep Boys arbitration agreement is severable from the rest of the agreement); *Fuller v. Pep Boys—Manny, Moe & Jack of Del., Inc.*, 88 F. Supp. 2d 1158, 1162 (D. Col. 2000) (same).

Having thus concluded that the cost-splitting provision was severable, the next section addresses the enforceability of the remainder of the arbitration agreement.

### C.   The Enforceability of the Remainder of the Pep Boys Agreement Under State Law

The district court concluded that the AAA's failure to follow the procedures set forth in the Pep Boys arbitration agreement constituted a material alteration of the agreement and also showed that there was a lack of a meeting of the minds with respect to the agreement itself. Based on these grounds, the district court held that the remainder of the arbitration agreement was unenforceable under Tennessee state law. Although we hold that the district court erred in reaching this conclusion, we agree with the district court that the procedures followed by the AAA in the present case were inconsistent with the terms of the Pep Boys arbitration agreement. Moreover, we share the district court's concern that the actions of an arbitrator can undermine the legitimacy of the arbitral forum. We hold, however, that the proper remedy in such cases is an order, pursuant to § 4 of the FAA, requiring that the arbitration proceedings conform to the terms of the arbitration agreement entered into by the parties.

---

[22]We have previously held that "illegal contract provisions should not render the entire contract void unless the 'forbidden provision is so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entity.'" *Chattanooga Mailers' Union, Local No. 92 v. The Chattanooga News-Free Press Co.*, 524 F.2d 1305, 1313 (6th Cir. 1975) (quoting *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 78 (1953)), *abrogation on other grounds recognized by Bacashihua v. United States Postal Service*, 859 F.2d 402 (6th Cir. 1988).

adjudication shall not affect the validity of the remainder of the Agreement." J.A. at 27. The district court, however, held that the remainder of the arbitration agreement was unenforceable under principles of Tennessee contract law and thus held that the entire agreement was unenforceable. In reaching this conclusion, the district court determined that the cost-splitting provision was severable from the rest of the agreement; had it reached the contrary conclusion, it would not have proceeded to consider the enforceability of the remainder of the agreement.

We agree with the district court's determination that the cost-splitting provision at issue in the present case was severable from the rest of the arbitration agreement. That provision was not interwoven with the rest of the agreement and may be deleted without affecting the rest of the agreement's provisions regarding arbitration. This conclusion is consistent with both Tennessee contract law[21] and our own

[21]For example, a Tennessee appellate court, applying the agreement's severability clause, enforced the remainder of an arbitration agreement after holding that a venue clause included in the agreement was invalid under Tennessee law. *See Knaffl v. Douglas Co.*, No. 03A01-9901-CH-00006, 1999 WL 894203, at *4 (Tenn Ct. App. 1999). The court reasoned that "[e]nforcement of a contract clause to arbitrate disputes is favored by legislative policy" and that "'[i]t is the responsibility of the courts to give as broad a construction to an arbitration agreement as the words and intentions of the parties, drawn from their expressions, will warrant, and to resolve any doubts in favor of arbitration.'" *Id.* (quoting *Wachtel v. Shoney's, Inc.*, 830 S.W.2d 905, 908 (Tenn. Ct. App. 1991); *see also Frizzell Constr. Co. v. Gatlinburg, LLC*, 9 S.W.3d 79, 85 (Tenn. 1999) (stating that "the cardinal rule" in Tennessee contract law "is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles," and that the parties' intent should be derived from, *inter alia*, "a fair construction of the terms and provisions of the contract") (quotations omitted); *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990) (stating that severability of contract is a matter of the parties' intent in entering into the contract).

claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims. . . . [T]he proper inquiry under *Gilmer* is not where the money goes but rather the amount of money that ultimately will be paid by the claimant. Indeed, we fail to see how a claimant could be deterred from pursuing his statutory rights in arbitration . . . where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court.

*Id.* (citations omitted). Under *Bradford,* the inquiry can be broken into three parts: (1) the potential litigant's ability to pay arbitration costs and fees; (2) the difference between the expected cost of arbitration to the litigant and the expected cost of a judicial forum; and (3) whether that difference "is so substantial as to deter the bringing of claims" in the arbitral forum. With respect to (1) and (2), *Bradford* emphasized that "an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs." *Id.* n.5. In keeping with *Green Tree*, the party opposing arbitration — i.e., the plaintiff — bears the burden of demonstrating these elements. *See Bradford*, 238 F.3d. at 557.

The *Bradford* test and similar approaches, however, suffer from at least two infirmities. First, requiring the plaintiff to come forward with concrete estimates of anticipated or expected arbitration costs asks too much at this initial stage in the proceedings. Before an arbitrator has been selected, for example, a plaintiff can only estimate the hourly rate that the arbitrator will charge. Under the *Bradford* case-by-case approach, such average figures may appear "too speculative" to support a finding that the costs are prohibitively expensive, even though the plaintiff has no other evidence of costs. Moreover, where arbitration agreements provide for the

shifting of fees and costs by the arbitrator on the basis of the arbitrator's decision on the merits, potential litigants (and reviewing courts) may not be able to gauge the likelihood of success or cost-shifting, especially prior to discovery.

One solution that some courts have suggested for the problem of providing evidence of the costs of arbitration is to require litigants to arbitrate their claims first and then to argue, upon judicial review of the arbitration award, that the costs that have been assessed are unreasonable. This solution is discussed and rejected in part II.A. *infra*.

Second, the *Bradford* case-by-case approach is inadequate to protect the deterrent functions of the federal anti-discrimination statutes at issue. The issue is not only whether an individual claimant would be precluded from effectively vindicating his or her rights in an arbitral forum by the risk of incurring substantial costs, but also whether other similarly situated individuals would be deterred by those risks as well. A cost-splitting provision should be held unenforceable whenever it would have the "chilling effect" of deterring a substantial number of potential litigants from seeking to vindicate their statutory rights. This issue is addressed in part II.B. *infra*.

## A.  *Post Hoc* Judicial Review of Arbitration Costs

A number of courts have suggested that judicial review of arbitration awards will adequately safeguard the remedial and deterrent functions of federal anti-discrimination statutes. *See, e.g.*, *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 16 (1st Cir. 1999) ("[I]f unreasonable fees were to be imposed . . . the argument . . . could be presented by the employee to the reviewing court."); *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 366 (7th Cir.) ("[W]e are convinced that judicial review of arbitration awards is sufficient to protect statutory rights."), *cert. denied*, 528 U.S. 811 (1999); *Boyd v. Town of Hayneville*, 144 F. Supp. 2d 1272, 1280-81 (M.D. Ala. 2001) (noting that

where the agreement itself provides that the plaintiff is liable, at least potentially, for arbitration fees and costs. The reason for this rule should be obvious. Our concern is that cost-splitting provisions will deter potential litigants from bringing their statutory claims in the arbitral forum. When the cost-splitting provision is in the arbitration agreement, potential litigants who read the arbitration agreement will discover that they will be liable, potentially, for fees if they bring their claim in the arbitral forum and thus may be deterred from doing so. Because the employer drafted the arbitration agreement, the employer is saddled with the consequences of the provision *as drafted*. If the provision, as drafted, would deter potential litigants, then it is unenforceable, regardless of whether, in a particular case, the employer agrees to pay a particular litigant's share of the fees and costs to avoid such a holding.[20]

However, as in Morrison's case, the arbitration agreement in Shankle's case included a severability clause. That clause stated, "If any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such

---

[20]Pep Boys also argues that the AAA will defer or waive its administrative fees in cases of extreme hardship, *see* J.A. at 98 (AAA Rules), and thus that Shankle would not be required to pay the fees if he could establish such hardship. This rule only relates to administrative fees such as the $500 non-refundable filing fee, which must be paid upon a filing of a demand for arbitration. The AAA granted Shankle a temporary fee waiver with respect to this payment. *See* J.A. at 179. These administrative fees, however, involve a separate obligation from the parties' obligation to share the arbitrator's costs. In a letter to Shankle and Pep Boys, the AAA informed the parties of the following:

> Compensation to the arbitrator(s) represents an independent obligation of the parties, and it is understood that the AAA has no liability, direct or indirect, for such payment. Each party shall promptly deposit in advance with the AAA such sums of money as required by the administrator to defray the costs of the arbitrator's fees.

J.A. at 259. The record does not indicate that the arbitrator's fees can be waived or deferred in the case of extreme hardship. Thus, Pep Boys' argument on this heading is largely irrelevant.

indicated that an Arbitrator had been selected and that the Arbitrator's fees would amount to $ 150.00 per hour and $ 150.00 per hour for study time. . . . [The AAA case manager] also states in her letter that Plaintiff is responsible for paying half of the fees which are to be deposited before the arbitration proceedings may begin. . . . Plaintiff is not able to pay the Arbitrator's fees and expenses and will not be able to proceed with his claim with the AAA.

J.A. at 257. Shankle had already represented to the court that he "[could not] afford to pay the filing fees or arbitrator's fees." J.A. at 179 (Shankle Aff.).

Given that the typical employment discrimination arbitration involves between fifteen and forty hours of arbitrator time, *see Shankle*, 163 F.3d at 1234 n.5, the arbitration in this case would result in costs between $2,250 and $6,000. Under the terms of the Pep Boys arbitration agreement, Shankle would be required to deposit between $1,125 and $3,000 with the arbitrator, ten days before the first hearing. Shankle was employed at Pep Boys as a mechanic and as a salesperson. Even without a searching inquiry into Shankle's income and overall financial situation, we conclude that such a provision would deter a substantial number of similarly situated potential litigants from seeking to vindicate their statutory rights in the arbitral forum. For this reason, the cost-splitting provision is not enforceable in the present case.

On appeal, Pep Boys argues that Shankle cannot meet his burden because it has agreed, in writing, to pay Shankle's share of the arbitration fee. Thus, Pep Boys argues that we need not reach the issue of the validity of the cost-splitting provision as that provision no longer applies to Shankle. Appellant's Supp. Br. at 27. We reject Pep Boys' argument in the present case. In considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs

"judicial review" of any arbitration award is available in rejecting argument that potential costs of arbitration were excessive); *Arakawa v. Japan Network Group*, 56 F. Supp. 2d 349, 355 (S.D.N.Y. 1999) (maintaining jurisdiction "over any subsequent petition with respect to the award"). Similarly, at least one court has held that the plaintiff should submit the issue of excessive arbitration costs to the arbitrator after the arbitrator reaches a conclusion on the underlying complaint. *See Klinedinst v. Tiger Drylac, USA, Inc.*, No. 01CV040, 2001 WL 1561821, at *14 (D.N.H. Nov. 28, 2001) (holding that "plaintiff cannot be forced to submit to an arbitration process that imposes costs that render the arbitral forum less accessible than a judicial forum," that the arbitrator is "obligated to [allocate costs and fees] in accordance with the law," and that therefore "plaintiff bears no risk by proceeding to arbitration"). It is apparently for these reasons that the dissent favors a post-arbitration evaluation of parties' ability to pay the costs.

*Post hoc* judicial review of arbitration awards as a means of guaranteeing the adequacy of the arbitral forum for protecting federal statutory rights has a kind of superficial attractiveness. If the issue is whether the costs of arbitration will make the arbitral forum prohibitively expensive for the individual plaintiff, then determining whether the actual costs of completed arbitration reach that level would be much simpler than determining, in advance, whether the projected costs of arbitration will reach that level. Requiring plaintiffs to arbitrate their claims and then argue, either to the arbitrator or to the reviewing court, that the costs were prohibitive avoids the problem identified in *Green Tree*, namely the "speculative" or "conjectural" nature of the costs of arbitration. The reviewing court would have before it the actual costs and would be charged with the task of determining whether those actual costs make the arbitral forum prohibitively costly. *See Klinedinst*, 2001 WL 1561821, at *14 ("By the time the arbitrator reaches the costs and fees issues, the record will obviously be far less vague and speculative than it is now."); *see also Arakawa*, 56 F.

Supp. 2d at 355 ("At this point in the litigation it is not clear how large the fees of the arbitration will be or whether plaintiff will be required to pay any portion of it . . . .").

This attractiveness is, however, only superficial; there are at least two problems with this approach. First, judicial review of arbitration awards is very narrow. *See, e.g.*, *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir.) (noting the "manifest disregard of the law" standard of review for arbitration awards and also noting that review is made even more difficult where arbitrators do not explain their decisions), *cert. denied*, 531 U.S. 878 (2000); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996) (discussing the standard for vacating an arbitration award based on "manifest disregard of the law" standard). Thus, it is not altogether clear that judicial review can adequately protect statutory rights in such cases. There is support in the case law, however, for the view that courts reviewing arbitration awards may vacate or reduce the assessment of costs in appropriate circumstances. *See Gilmer*, 500 U.S. at 32 n.4 (noting that judicial review of arbitration awards "is sufficient to ensure that arbitrators comply with the requirements of the statute at issue" (quotation omitted)); *Boyd*, 144 F. Supp. 2d at 1280-81 (quoting *Gilmer* in support of the view that judicial review of arbitration awards is adequate to protect statutory rights).

Second, even if judicial review could serve this function, in the abstract, there is a more telling problem with this "arbitrate first and review the award of costs later" approach. The issue is whether the risk of incurring the potential costs of arbitration is great enough to deter the plaintiff from bringing her statutory claims. The dissent overlooks a critical aspect of how deterrence operates. After the plaintiff has arbitrated her claims, reviewing courts will not likely determine that this risk deterred the plaintiff; after all, the

that Morrison was not required to pay any share of the costs of the arbitration and that the arbitrator did not apply the limitation on remedies. Given these facts, remand is not necessary, and thus we will affirm the district court's order compelling arbitration, on these different grounds.

## IV.  Shankle (No. 99-5897)

### A.  Standard of Review

We review de novo a district court's determinations regarding the existence of a valid arbitration agreement. *See, e.g.*, *Floss*, 211 F.3d at 313. As explained *supra*, we review the enforceability of the arbitration agreement according to the applicable state law of contract formation, which the parties seem to agree is provided by Tennessee law.

### B.  Cost-Splitting

Turning to the issues raised in Shankle's case, we hold that the cost-splitting provision at issue in Shankle's case was not enforceable under the standard provided in section II.B. *supra*. That provision, quoted in section I.B *supra*, required Shankle to pay one-half of the arbitrator's fee and to deposit that amount with the arbitrator ten days prior to the first arbitration hearing.

The district court in Shankle's case relied on *Cole* and *Shankle* to hold that cost-splitting provisions are *per se* invalid. As discussed *supra*, in light of *Green Tree*, cost-splitting provisions must be evaluated on a case-by-case basis. Shankle, however, provided the court with evidence regarding the anticipated costs of arbitration, and the evidence provided by Shankle to the district court is sufficient for evaluation under the standard announced in this opinion. In a supplemental memorandum, Shankle represented to the district court:

On or about March 31, 1999, Plaintiff's counsel received a letter from [the AAA case manager], which

provision at issue in this case are "in conflict with a mandatory provision of applicable law." Thus, it could be argued that the parties did not intend for Rule 18 to apply in circumstances such as this, when a court holds that provisions of the arbitration agreement prevent the effective vindication of statutory rights under federal law rather than that a particular provision conflicts "with a mandatory provision of applicable law." The applicability of Rule 18 in these circumstances thus presents a close question.

Even though it is unclear under state law whether we should construe the language of Rule 18 in the present case to permit arbitration, Supreme Court precedent dictates that we resolve any doubts as to arbitrability "in favor of arbitration." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25. Similarly, we have held recently that, when the arbitration agreement at issue includes a severability provision, courts should not lightly conclude that a particular provision of an arbitration agreement taints the entire agreement. *Accord Great Earth Cos. v. Simons*, 288 F.3d 878, 890-91 (6th Cir. 2002) (holding that when agreement includes severability provision, intent of the parties and policy in favor of arbitration dictate that rest of agreement should be held enforceable). For these reasons, we agree with the Eighth Circuit that Rule 18 manifests the parties' intent "to sever any terms determined to be invalid and to allow all claims to proceed to arbitration under the remaining provisions of the agreement." *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir. 2001).

## F. Conclusion

Having held that the cost-splitting and limitation on remedies provisions are severable from the Circuit City arbitration agreement as a whole, we conclude that the district court erred in compelling arbitration in the present case without first severing these unenforceable provisions from the agreement. In the present case, however, the arbitration has already taken place, and we have been informed by the parties

plaintiff has already arbitrated her claims.[8] In *Ahing v. Lehman Bros., Inc.*, No. 94Civ.9027(CSH), 2000 WL 460443, at *13 (S.D.N.Y. April 18, 2000), for example, the court concluded that arbitration fees of $1,950, assessed against the plaintiff, a former Lehman Brothers receptionist, "were objectively moderate." The *Ahing* court did not explain its conclusion that this award was reasonable other than to state that "plaintiff has not shown that they are so great relative to her financial circumstances that their imposition prevented her from having a full opportunity to vindicate her Title VII rights in the arbitration forum." *Id.* In the *Ahing* court's words, the plaintiff simply had not made a showing that potential arbitration costs "prevented her from having a full opportunity to vindicate her Title VII rights in the arbitration forum." *Id.* Deterrence occurs early in the process. If we do not know who will prevail on the ultimate cost-splitting question until the end, we know who has lost from the beginning: those whom the cost-splitting provision deterred from initiating their claims at all.

In sum, the *post hoc* judicial review approach places plaintiffs in a kind of "Catch-22." They cannot claim, in advance of arbitration, that the risk of incurring arbitration costs would deter them from arbitrating their claims because they do not know what the costs will be, but if they arbitrate and actually incur costs, they cannot then argue that the costs deterred them because they have already arbitrated their claims. Just as Yossarian could not escape flying combat missions by claiming that he was crazy because anyone wanting to be released from combat must be sane, under this approach potential litigants cannot escape arbitration by claiming that the costs are prohibitive until after arbitration,

---

[8]Circuit City actually suggests this argument in this appeal. *See* Appellee's Supp. Br. at 14 ("These limited costs are not a barrier to the arbitral forum because they do not (and *did* not) prevent Morrison from pursuing arbitration."). A similar point was made by counsel at oral argument.

at which point the costs were not prohibitive, because the litigants actually arbitrated their disputes.

For these reasons, we reject the judicial-review approach. In the next section, we adopt a case-by-case approach to this issue that we believe is more protective of statutory rights than that adopted by the Fourth Circuit in *Bradford*.

## B. Revised Case-by-Case Approach

We hold that potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum. Our approach differs from the case-by-case approach advocated in *Bradford* by looking to the possible "chilling effect" of the cost-splitting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case. This difference in approach is premised on *Gilmer*, which held that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." 500 U.S. at 28 (quotation omitted). As *Gilmer* makes clear, federal anti-discrimination statutes play both a remedial and deterrent role. Although the former role is largely a matter of the rights of particular aggrieved individuals, the latter is a question of "broader social purposes." *Id.* The deterrent function of the laws in question is, in part, that employers who engage in discriminatory practices are aware that they may incur liability in more than one case. If, however, a cost-splitting provision would deter a substantial number of potential litigants, then that provision undermines the deterrent effect of the anti-discrimination statutes. Thus, in order to protect the statutory rights at issue, the reviewing court must look to more than just the interests and conduct of a particular plaintiff. A particular plaintiff may be determined to pursue his or her claims, regardless of costs. But a court

place *at the time of the filing of arbitration*. Thus, the limitation on remedies is properly before this court on this appeal.

The severability of the limitation on remedies provision is considered in the next section.

## E. Severability

In the preceding sections, we have held that, in Morrison's case, neither the cost-splitting provision nor the limitation on remedies was enforceable. Given these holdings, we must determine whether those provisions are severable from the agreement as a whole or whether they render the entire agreement unenforceable.

Under Ohio law, "[t]he severability of a contract is a question of law and depends upon the intent of the parties." *Toledo Police Patrolmen's Ass'n v. City of Toledo*, 641 N.E.2d 799, 803 (Ohio Ct. App.), *appeal denied*, 639 N.E.2d 795 (Ohio 1994). "Whether a contract . . . is entire or divisible depends generally upon the intention of the parties, and this must be ascertained by the ordinary rules of construction . . . ." *Id.* (quotations omitted).

The arbitration agreement at issue in the present case contains a severability clause. Rule 18 of the arbitration agreement states, in relevant part:

> In the event that any of these [rules] is held to be in conflict with a mandatory provision of applicable law, the conflicting [rule] shall be modified automatically to comply with the mandatory provision of applicable law until such point as these [rules] may be modified in accordance with Rule 19 below. In the event of an automatic modification with respect to a particular [rule], the remainder of these [rules] shall not be affected.

J.A. at 136. In the present case, it is not entirely clear that the cost-splitting provision and the limitation on remedies

addition, the Fourth Circuit[17] and district courts in Missouri[18] and Alabama[19] have held this same provision unenforceable.

Furthermore, Circuit City now acknowledges the unenforceable nature of the limitation provision. *See* Appellee's Supp. Br. at 9-10. Indeed, Circuit City's counsel informed us at oral argument that, as of January 1, 2001, Circuit City modified its arbitration agreement and deleted the limitation on remedies that is at issue in the present case. If Morrison had brought her claims after that date, then the limitation on remedies would not have applied to her case; however, Rule 19 of the arbitration agreement clearly states that arbitrations are subject to the rules and procedures in

---

[17]*See Johnson v. Circuit City Stores, Inc.*, No. 99-1449, 2000 WL 19166, at *2 (4th Cir. Jan. 12), *cert. denied*, 530 U.S. 1276 (2000).

[18]*See Gannon v. Circuit City Stores, Inc.*, No. 4:00-CV-330 JCH, 2000 WL 1062102 (E.D. Mo. July 10, 2000), *rev'd on other grounds*, 262 F.3d 677 (8th Cir. 2001). The district court held that the limitation on punitive damages under the Circuit City arbitration agreement prevented the plaintiff "from effectively vindicating her rights." *Id.* at *3. In addition, the district court concluded that the offending provision was not severable. The Eighth Circuit reversed, holding that the provision limiting remedies was severable. *See* 262 F.3d at 681. Circuit City apparently did not appeal the district court's conclusion that the provision was unenforceable in that case. *See id.* In its supplemental *amicus* brief, the EEOC suggests that Circuit City's appeal in *Gannon* shows that the company no longer enforces the limitation on punitive damages in its arbitration agreement. *See* EEOC Supp. Amicus Br. at 14-15; *see also Gannon*, 262 F.3d at 679 (noting that Circuit City moved the district court to reconsider its holding that the limitations provision was unenforceable, as "it no longer enforced the . . . clause").

[19]*See Wright v. Circuit City Stores, Inc.*, 82 F. Supp. 2d 1279, 1286 (N.D. Ala. 2000) ("Because punitive damages and back/front pay are important deterrents to employers who might otherwise discriminate on the basis of race, the failure of the Circuit City arbitration provision to provide remedies equivalent to those allowed under [federal law] prevents the Plaintiffs from effectively vindicating their rights."). The *Wright* court, like the Eighth Circuit in *Gannon*, concluded that the offending provision was severable. *See id.* at 1287.

---

considering whether a cost-splitting provision is enforceable should consider similarly situated potential litigants, for whom costs will loom as a larger concern, because it is, in large part, their presence in the system that will deter discriminatory practices. Nothing in *Green Tree* suggests that a case-by-case analysis should not treat similar cases similarly.

For this reason, if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute. In conducting this analysis, the reviewing court should define the class of such similarly situated potential litigants by job description and socioeconomic background. It should take the actual plaintiff's income and resources as representative of this larger class's ability to shoulder the costs of arbitration. But, as one district court has noted, *Green Tree* "does not necessarily mandate a searching inquiry into an employee's bills and expenses." *Giordano v. Pep Boys—Manny, Moe & Jack, Inc.*, No. CIV. A. 99-1281, 2001 WL 484360, at *6 (E.D. Pa. March 29, 2001).[9]  "[N]othing in *Green Tree*

---

[9]The *Giordano* case involved a plaintiff very similar to the plaintiff in the Shankle case. After reviewing the case law, Judge Pollak held:
    This is an easy case. Giordano was a fairly low-level employee of Pep Boys earning a relatively low wage of $400.00 per week at the time of his termination. He avers that he could not afford the filing fees and arbitrators' costs for which he would be responsible pursuant to the agreement and the AAA's rules. Giordano is similar to the plaintiffs in *Cole* and *Shankle* and unlike the wealthier employees in [other cases]. . . .
2001 WL 484360, at *6. As Judge Pollak noted in *Giordano*, many of the cases finding cost-splitting provisions enforceable involved "highly paid employees," relatively speaking. *See, e.g., Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 558 n.6 (4th Cir. 2001) (holding that litigant with annual base salary of $115,000 and average yearly bonuses, in three previous years, of $53,000, was not deterred from arbitration by risk of incurring costs).

requires courts to undertake detailed analyses of the household budgets of low-level employees to conclude that arbitration costs in the thousands of dollars deter the vindication of employees' claims in arbitral fora." *Id.*

Moreover, in addressing the effect of arbitration costs on a class, the reviewing court should look to average or typical arbitration costs, because that is the kind of information that potential litigants will take into account in deciding whether to bring their claims in the arbitral forum. In considering the decision-making process of the typical member of a class, it is proper to take into account the typical or average costs of arbitration.

In analyzing this issue, reviewing courts should consider the costs of litigation as the alternative to arbitration, as in *Bradford*, but they must weigh the potential costs of litigation in a realistic manner. In many, if not most, cases, employees (and former employees) bringing discrimination claims will be represented by attorneys on a contingency-fee basis. Thus, many litigants will face minimal costs in the judicial forum, as the attorney will cover most of the fees of litigation and advance the expenses incurred in discovery. Thus, in many cases it might be concluded that, considering the costs incurred by the employee litigant, there is little or no difference between the expenses of the judicial and arbitral fora — with one important exception. In the arbitral forum, the litigant faces an additional expense — the arbitrator's fee and costs — which are never incurred in the judicial forum. *See Cole*, 105 F.3d at 1484 ("[W]e are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case."). Reviewing courts must consider whether the litigant will incur this additional expense and whether that expense, taken together with the other costs and expenses of the differing fora, would deter potential litigants from bringing their statutory claims in the arbitral forum. The issue is not "the fact that [the] fees would be paid to the arbitrator," *Bradford*, 238 F.3d at 556,

Our conclusion on this point finds support in the decisions of other courts considering the same arbitration agreement. The Ninth Circuit recently held that the limitations on remedies in Circuit City's arbitration agreement were not enforceable under *Gilmer*. *See Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir.) ("Circuit City's arbitration agreement . . . fails to provide for all of the types of relief that would otherwise be available in court . . . ."), *cert. denied*, --- U.S. ---, 122 S. Ct. 2329 (June 3, 2002). In

---

although Morrison has asserted that the discovery allowed under the Circuit City arbitration rules is more limited than that generally allowed in federal district court, she has failed even to attempt to show that such restrictions prevent either her or any other claimants from presenting their claims. Additionally, Morrison has failed to show that the one-year limitations period in the agreement unduly burdened her or would unduly burden any other claimant wishing to assert claims arising from their employment. Therefore, we reject Morrison's arguments regarding the discovery and limitations provisions in the Circuit City arbitration agreement.

Because the limitation on remedies found in the Circuit City arbitration agreement significantly undermines Title VII's remedial purpose of making victims of discrimination whole and its deterrent purposes of forcing employers to eliminate and prevent discriminatory practices in the workplace, we hold that the provision at issue in this case was not enforceable. *See Paladino*, 134 F.3d at 1062 (noting that the arbitrability of discrimination "claims rests on the assumption that the arbitration clause permits relief *equivalent* to court remedies") (emphasis added); *Trumbull v. Century Mktg. Corp.*, 12 F. Supp. 2d 683, 688 (N.D. Ohio 1998) (holding that an arbitration clause was unenforceable because it prohibited an award of punitive damages, which was available to the plaintiff under Title VII); *cf. Perez*, 253 F.3d at 1286 (holding that "federal statutory claims are arbitrable only when arbitration can serve the same remedial and deterrent functions as litigation, and an agreement that limits the remedies available cannot adequately serve those functions").[16]

---

award the prevailing party attorney fees. For this reason, we do not hold that the attorney fees provision in the Circuit City arbitration agreement is unenforceable. The provision at issue in the present case is thus distinguishable from that at issue in *McCaskill v. SCI Management Corp.*, 285 F.3d 623, 625 (7th Cir. 2002), which required each party to pay its own fees, "regardless of the outcome of the arbitration." If arbitration is to offer claimants the full scope of remedies available under Title VII, arbitrators in Title VII cases, just like courts, must be guided by *Christiansburg* and must ordinarily grant attorney fees to prevailing claimants.

[16]We conclude, however, that the provisions regarding discovery and the limitations period for filing a request for arbitration in the agreement at issue are enforceable. In *Gilmer*, the Supreme Court rejected an argument similar to Morrison's regarding discovery, noting that it was "unlikely . . . that . . . discrimination claims require[d] more extensive discovery than other claims that [the Court] found to arbitrable, such as RICO and antitrust claims." *Gilmer*, 500 U.S. at 31. The Supreme Court further held that the claimant had failed to make a showing that the discovery provisions for arbitration "will prove insufficient to allow . . . claimants . . . a fair opportunity to present their claims." *Id.* In this case,

but rather whether the "overall cost of arbitration," *id.*, from the perspective of the potential litigant, is greater than "the cost of litigation in court," *id.*

Finally, under this analysis, the reviewing court should discount the possibilities that the plaintiff will not be required to pay costs or arbitral fees because of ultimate success on the merits, either because of cost-shifting provisions in the arbitration agreement or because the arbitrator decides that such costs or fees are contrary to federal law. The issue is whether the terms of the arbitration agreement itself would deter a substantial number of similarly situated employees from bringing their claims in the arbitral forum, and thus the court must consider the decision-making process of these potential litigants. In many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration.

This analysis will yield different results in different cases. It will find, in many cases, that high-level managerial employees and others with substantial means can afford the costs of arbitration, thus making cost-splitting provisions in such cases enforceable. *See, e.g.*, *Williams*, 197 F.3d at 764-65 (concluding that individual with six-figure income was not deterred from arbitral forum by cost-splitting provision). In the case of other employees, however, this standard will render cost-splitting provisions unenforceable in many, if not most, cases. *See, e.g.*, *Shankle*, 163 F.3d at 1234-35 ("Assuming Mr. Shankle's arbitration would have lasted an average length of time, he would have had to pay an arbitrator between $1,875 and $5,000 to resolve his claims. Mr. Shankle could not afford such a fee, and it is unlikely other

similarly situated employees could either.") (footnote omitted).[10]

### III. Morrison (No. 99-4099)

#### A. Standard of Review

We review de novo an order compelling arbitration. *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001).[11] In deciding whether to compel arbitration of a federal statutory claim, we first consider whether the statutory claim is generally subject to compulsory arbitration. If the claim is not exempt from arbitration, we must then consider whether the arbitration

---

[10]To those who would complain that employers should not be required to pay all the costs of the arbitral forum in cases where the cost-splitting provision is held unenforceable, we respond that no one is requiring employers to pay any arbitration expenses at all. To the contrary, it is employers who choose to require their employees, as a condition of their employment, to enter into arbitration agreements. If employers find the costs of arbitration too great, they could simply end the practice of imposing mandatory arbitration agreements on their employees and litigate the statutory claims brought against them. We are skeptical, however, that this will happen as a result of our decision in the present case. At oral argument, counsel for Circuit City stated that arbitrators often required the company to pay the employee's share of the costs of the arbitration, despite the terms of the arbitration agreement, and that the company routinely complies with such cost-shifting. The reason for this willingness to comply with cost-shifting, of course, is that the cost-savings of the arbitral forum to employers exist regardless of whether cost-splitting provisions are enforced. Employers, after all, do not enter into contingency-fee arrangements with members of the defense bar, and thus arbitration is much less expensive than litigation from their perspective, even when they are required to cover the entire cost of the arbitration.

[11]In *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000), the Supreme Court unanimously held that a district court order compelling arbitration and dismissing all the claims before the court is immediately appealable under 9 U.S.C. § 16(a)(3). After *Green Tree*, our jurisdiction in the present appeal is clearly established.

Circuit City's arbitration agreement, which limits punitive damages to the greater of $5,000 or the sum of a claimant's backpay and front pay awards, eviscerates Congress's intent to utilize punitive damages as a tool for combating discrimination, particularly in cases where no backpay or front pay is awarded. Even if Morrison were to receive the maximum amount of backpay and front pay available to her under Circuit City's arbitration agreement, she could receive only $162,000 in punitive damages, less than sixty percent of the $300,000 she could potentially obtain under Title VII. Furthermore, whereas Title VII would allow Morrison to collect a total compensatory and punitive damages award of $300,000, even if no backpay or front pay award had been given, Circuit City's arbitration agreement would allow only a $5,000 punitive damages award in such a case. Likewise, whereas Title VII would allow Morrison to collect up to $300,000 in punitive damages, even if only nominal damages were awarded, Circuit City's arbitration agreement would limit any such an award to $5,000. *See Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998) (holding that punitive damages are available in an intentional discrimination action even if the jury does not assess compensatory damages); *Beauford v. Sisters of Mercy-Province of Detroit, Inc.*, 816 F.2d 1104, 1108 (6th Cir.) (holding that "a plaintiff who proves a cause of action under § 1981 may recover punitive damages where the plaintiff is entitled to an award of compensatory damages, even if nominal"), *cert. denied*, 484 U.S. 913 (1987).[15]

---

[15]The attorney fees provision found in Rule 13 could also be read as limiting a Title VII plaintiff's remedies in an important sense. Although the rule in effect at the time Morrison brought her claims granted the arbitrator the discretion to award the claimant attorney fees, it did not state that the arbitrator should grant attorney fees "in accordance with applicable law." Under Title VII, it is clear that "a prevailing *plaintiff* ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978). The wording of the arbitration agreement, however, is very similar to the statutory provision in question, § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k), which authorizes the court, "in its discretion," to

the terms of the limitations found in the arbitration agreement than she could have under Title VII.

In sum, the Circuit City arbitration agreement does more than limit Morrison's potential monetary remedy for discrimination by limiting any backpay and front pay awards. In addition, it also prevents the remedial principles of Title VII from being effectuated because it does not allow Morrison to be fully compensated for any harms caused by wrongful discrimination.[14]   Similarly, Circuit City's arbitration agreement undermines the deterrent purposes of Title VII by placing stringent limits on punitive damages available to Morrison and other claimants under the arbitration agreement. The Supreme Court has repeatedly acknowledged that monetary awards for claimants who bring discrimination claims often serve as an incentive for employers to eliminate their discriminatory practices.  *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545 (1999); *see also McKennon*, 513 U.S. at 358 ("Congress designed the remedial measures in [Title VII] to serve as a spur or catalyst to cause employers to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of discrimination.") (quotations omitted); *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 466 (6th Cir. 1999) (noting that Congress approved of damages as a tool for eradicating discrimination "when it added the remedies of compensatory and punitive damages by enacting the Civil Rights Act of 1991").

---

[14]Moreover, Circuit City's arbitration agreement further undercuts Congress's intent in providing backpay awards because it allows deductions to made from such awards due to interim private and public benefits received by the claimant, a rule that directly contravenes Sixth Circuit precedent providing that backpay awards may not reduced by any public or private benefits a claimant has received between the date of her termination and the judgment. *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1100 (6th Cir.), *cert. denied*, 519 U.S. 963 (1996); *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 627 (6th Cir. 1983), *cert. denied*, 466 U.S. 950 (1984).

agreement is valid.  *See id.*  Because we have previously held that Title VII claims may be heard in an arbitral forum, *see Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 309 (6th Cir. 1991), we proceed to the second step in the review process, *i.e.*, determining whether the Circuit City arbitration agreement is valid and enforceable.

Under section 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  We review the enforceability of an arbitration agreement according to the applicable state law of contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995).  In Morrison's case, we apply the Ohio law of contract formation, as Morrison was employed by Circuit City in the state of Ohio, and the parties have agreed that Ohio law applies.  *See* J.A. at 133 (Arbitration Agreement) (stating that "[t]he Arbitrator shall apply the substantive law of the State in which the Associate is or was predominantly employed").

## B.  Enforceability of the Agreement

Before considering Morrison's arguments on cost-splitting and the limitation on remedies under the Circuit City arbitration agreement, we first consider a variety of arguments that she raises with respect to the formation of the contract under state law.

Morrison first argues that the arbitration agreement is unconscionable because it contains unfair and unreasonable terms concerning remedies, the payment of arbitration fees, discovery, and the limitations period for requesting arbitration.  Morrison also argues that the agreement was procedurally unconscionable because of the disparity in bargaining power between the parties to the agreement. Under Ohio law, the unconscionability doctrine has two components:

(1) substantive unconscionability, *i.e.*, unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.*, individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible. Both elements must be present to find a contract unconscionable.

*Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.*, 758 N.E.2d 1173, 1181 (Ohio Ct. App. 2001) (quotation omitted); *accord Dorsey v. Contemporary Obst. & Gyn., Inc.*, 680 N.E.2d 240, 243 (Ohio Ct. App. 1996).

Although we have serious doubts about the fairness and reasonableness of the contract terms at issue here, under Ohio law we conclude that the agreement process in this particular case did not rise to the level of procedural unconscionability. In determining procedural unconscionability, Ohio courts look to "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible." *Cross v. Carnes*, 724 N.E.2d 828, 837 (Ohio Ct. App. 1998). "The crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print . . . ?'" *Ohio Univ. Bd. of Trs. v. Smith*, 724 N.E.2d 1155, 1161 (Ohio Ct. App. 1999) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965), and *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 189 (Ohio 1993)) (alterations in original). On the particular facts at issue here, we cannot find that the procedure was unconscionable. Although the bargaining power was not equal, and the contract was drafted by Circuit City and was apparently not open to negotiation, we do not suppose that Ohio courts would find this highly educated plaintiff, who graduated from the Air Force Academy and

Second, federal law does not limit Morrison's total damages but rather only limits the sum of her compensatory and punitive damages; furthermore, it places no limits on the amount of backpay or front pay that Morrison may receive. Indeed, 42 U.S.C. § 1981a explicitly states that "[c]ompensatory damages awarded under this section *shall not include backpay*, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." 42 U.S.C. § 1981a(b)(2) (emphasis added). Additionally, federal law does not require that a claimant's front pay award must be limited to only two years of her salary. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001). Therefore, in addition to the $300,000 in compensatory and punitive damages that Morrison could receive under Title VII, she could also collect an award of backpay from the date of her termination[13] to the date on which she receives a judgment in this case, which may consist of many years of backpay, and she could also receive a front pay award in excess of the mere two years allowed under the arbitration agreement. In other words, if Morrison had received a favorable judgment in court, in theory she could have collected a backpay award equal to three times her salary, as opposed to one, and a front pay award, which if given in lieu of reinstatement could have equaled as much as the amount of pay she would have received from the date of her judgment to the date of her retirement. *See, e.g.*, *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 511 (9th Cir. 2000) (upholding front pay award based on twenty-two years of future earnings); *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 125-26 (2d Cir. 1996) (upholding front pay award based on twenty years of future earnings). Given this analysis, Circuit City is simply incorrect in asserting that Morrison could have recovered more under

---

[13]Section 2000e-5(g)(1) allows for an award of backpay "from a date [no] more than two years prior to the filing of [her] charge with the Commission." As Morrison filed her charge with the EEOC within a few months after her termination, under Title VII, she would be eligible for a backpay award starting from the date of her termination.

damages in accordance with applicable law; and punitive damages up to $5,000 or the sum of a claimant's backpay and front pay awards, whichever is greater.

Circuit City argues, somewhat counter-intuitively, that such limits do not undermine the purposes of Title VII because Morrison could potentially receive a greater sum of damages under its agreement than she could receive under Title VII. As we read the terms of the arbitration agreement, however, Circuit City's argument is flawed for a number of reasons. First, under Circuit City's arbitration agreement, Morrison could not collect a potential compensatory and punitive damages award of $538,000, Appellee's Br. at 10 n.4, but only $462,000. To calculate this, we suppose that an arbitrator were to award Morrison the full amount of each compensatory damages that the arbitration agreement allows. Because the agreement's Rule 14(5) allows compensatory damages "in accordance with applicable law," we suppose an award of $300,000, the maximum figure allowed under Title VII. We then suppose that the arbitrator were to award Morrison punitive damages under Rule 14(6), which the agreement caps at amount "equal to the monetary award, if any, rendered pursuant to Subsections 3 and/or 4" of Rule 14. Supposing that the arbitrator were to award punitive damages equal to the maximum allowed under Rules 14(3) and 14(4), Morrison would receive punitive damages equal to Rule 14(3)'s maximum of one year of backpay, or $54,000,[12] and Rule 14(4)'s maximum of two years of front pay, or $108,000. The sum of these figures — the agreement's maximum compensatory damages and the maximum punitive damages — is $462,000.

---

[12]Circuit City apparently arrived at its figure of $538,000 by assuming that Morrison would receive twenty-nine months of backpay, which would cover the time from when she was fired to the date of her arbitration, which was scheduled for April of 2000. However, Circuit City's agreement explicitly limits a backpay award to "only up to one year."

held a master's degree in administration, a victim of procedural unconscionability. *Cf. Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1300 (Ohio Ct. App. 1993) (refusing to find procedural unconscionability where Harvard graduate with "extensive business and contracting experience" admitted to seeing the relevant clause but failed to read its contents). Accordingly, on these facts, we find that there was no procedural unconscionability.

Morrison next argues that the arbitration agreement is unenforceable because it is unsupported by consideration and because there is no mutuality of obligation. Morrison argues that there was no mutuality of obligation or consideration for the arbitration agreement because Circuit City had the power to alter or terminate the agreement on December 31 of each year upon giving thirty days' notice to its employees. We conclude, however, that the Circuit City arbitration agreement was supported by sufficient consideration and a mutuality of obligation. In making this determination, we look to Ohio law. Although the Ohio Supreme Court has not yet addressed this question, two courts of appeals have addressed related questions. The first is *Harmon v. Philip Morris, Inc.*, 697 N.E.2d 270 (Ohio Ct. App. 1997). In *Harmon*, the court ruled that an arbitration agreement requiring employees to submit their claims to arbitration but imposing no reciprocal obligation on the employer, and giving the employer the right to amend or terminate the arbitration program "at any time," lacked consideration because it "neither offered a benefit to its employees nor incurred any detriment by modifying the terms of the employment relationship." *See id.* at 272. The Circuit City agreement is identical to the agreement at issue in *Harmon* in that it requires employees to submit their disputes to arbitration but makes no similar demand on the employer. J.A. at 128. Accordingly, the only question is whether the Circuit City's timing provision, which allows Circuit City to amend unilaterally the agreement only on a specified date, is enough of a limitation to constitute consideration.

The second relevant Ohio case, *Century 21 American Landmark, Inc. v. McIntyre*, 427 N.E.2d 534 (Ohio Ct. App. 1980), may provide some insight on this question.  In that case, the court stated that "a contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." *Id.* at 536-37.  Although the court did not define the sorts of limits that would be relevant to such an inquiry, it found a limit sufficient when a homeowner's unilateral power to terminate a home sale contract "arose only upon the happening of an event, i.e. a repair order resulting from [a third-party inspection of the home], over which the [homeowner] had no control." *Id.* at 537.  This could suggest that Ohio courts would consider a unilateral right to amend or terminate a contract "unlimited" whenever the power lies entirely within the amending or terminating party's control and subject only to that party's decision to amend or terminate.

We are hesitant to divine such a principle from the Ohio courts on the basis of this single decision, when that decision itself expresses no such principle and is equally consistent with an opposing interpretation.  Although we cannot be certain how Ohio courts will proceed, we conclude that Ohio courts would find consideration sufficient and the contract enforceable.  We do this in part based on the Restatement (Second) of Contracts, which considers a thirty-days-notice provision sufficient to constitute consideration.  The Restatement suggests that when A promises B to act as B's agent for three years on certain terms, and B agrees but reserves the power to terminate the agreement on thirty days notice, "B's agreement is consideration, since he promises to continue the agency for at least thirty days."  Restatement (Second) of Contracts § 77 cmt. b, illus. 1 (1979).  In contrast, if B reserves the right to terminate "at any time," the agreement lacks consideration, "since it involves no promise" by B.  *Id.* at cmt. a, illus. 2.  Accordingly, the Restatement suggests that Circuit City's promise to maintain the

Title VII and would thereby contravene Congress's intent to utilize certain damages as a tool for compensating victims of discrimination and for deterring employment discrimination more broadly.  The critical question is not whether a claimant may obtain *some* amount of the entire range of remedies under Title VII, but whether the limitation on remedies at issue undermines the rights protected by the statute. *See Gilmer*, 500 U.S. at 26-27.  *See also McCaskill v. SCI Mgmt. Corp.*, 285 F.3d 623, 626 (7th Cir. 2002) (holding that arbitration agreement that did not provide for award of attorney fees to successful Title VII claimant was unenforceable because "[t]he right to attorney's fees . . . is central to the ability of persons to seek redress from violations of Title VII"); *Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1286 (11th Cir. 2001) ("[F]ederal statutory claims are arbitrable only when arbitration can serve the same remedial and deterrent functions as litigation, and an agreement that limits the remedies available cannot adequately serve those functions.") (citing *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1061-62 (11th Cir. 1998)).

The limitation on remedies provision at issue in Morrison's case undermines both the remedial and deterrent principles of Title VII.  The arbitration agreement's limitation on remedies clearly impedes Title VII's remedial goal of "making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).  The Supreme Court has consistently recognized that one of the objects of Title VII is "[c]ompensation for injuries caused by the prohibited discrimination." *See, e.g., McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 (1995).  In this case, the remedies potentially available to make Morrison whole were significantly limited under the arbitration agreement, which allows only injunctive relief, including reinstatement; one year of backpay and reimbursement for lost fringe benefits (which may be further reduced by interim earnings or public/private benefits received); two years of front pay if reinstatement is not possible; compensatory

agreement would deter a substantial percentage of potential litigants from bringing their claims in the arbitral forum.

The provision reducing the (former) employee's exposure to the greater of $500 or three percent of her annual compensation presents a closer issue. However, a potential litigant considering arbitration would still have to arrange to pay three percent of her most recent salary, in this case, $1,622, within a three-month period, or risk incurring her full half of the costs under the default rule. Faced with this choice — which really boils down to risking one's scarce resources in the hopes of an uncertain benefit — it appears to us that a substantial number of similarly situated persons would be deterred from seeking to vindicate their statutory rights under these circumstances.

Based on this reasoning, we hold that Morrison has satisfied her burden in the present case in demonstrating that the cost-splitting arrangement in the Circuit City arbitration agreement would deter a substantial number of similarly situated persons from attempting to vindicate their statutory rights in the arbitral forum, and thus that the cost-splitting provision in the agreement was unenforceable with respect to her claims. The severability of the provision is considered in section III.E *infra*.

## D. Limitation on Remedies in the Circuit City Arbitration Agreement

We also conclude that the limitations that the Circuit City arbitration agreement places on the damages a claimant may recover from arbitration are unenforceable. It is well-established that "a party does not forgo the substantive rights afforded by [a] statute [when she agrees to arbitrate a statutory claim but] only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26 (quotation omitted). In this case, however, the enforcement of the arbitration agreement would require Morrison to forego her substantive rights to the full panoply of remedies under

arbitration agreement for at least thirty days, and until the end of each calendar year, constitutes sufficient consideration. So although the Ohio courts do not appear to have addressed this issue, we adopt a position that is consistent with their decisions and endorsed by the Restatement. *See also Harmon*, 697 N.E.2d at 272 (noting that under Ohio law, "a detriment to the promisee" such as "forbearance . . . by the promisee" may constitute consideration).

Further, the present case is distinguishable from *Floss*, in which we concluded that an arbitration agreement was unenforceable because the employer had "unfettered discretion in choosing the nature of [the arbitral] forum" and could alter the applicable rules and procedures without any notice to or consent from employees. *Floss*, 211 F.3d at 315-16; *see also Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938-40 (4th Cir. 1999) (holding that an arbitration agreement was invalid because, *inter alia*, the employer could modify the rules at any time without notice). Unlike in *Floss*, in this case Circuit City had the authority to alter the agreement on only one day of each year and had to provide its employees with thirty days' notice before doing so.

Morrison also argues that the arbitration agreement was ineffective to waive prospective claims because she did not have any basis upon which to bring an action against Circuit City when she signed the agreement. In reviewing whether a waiver of prospective claims was valid, we apply ordinary contract principles, "remaining alert to ensure that employers do not defeat the policies of . . . Title VII by taking advantage of their superior bargaining position or by overreaching." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995). "In evaluating whether a [waiver] has been knowingly and voluntarily executed, we look to (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Id.*

Considering these factors, we conclude that Morrison knowingly and voluntarily waived her right to pursue her employment claims in federal court. The record shows that Morrison was a highly educated managerial employee who was capable of understanding the terms of the agreement. Additionally, the waiver of the right to file suit in federal court was plain. In fact, Morrison does not allege that she did not understand the agreement or that the agreement was unclear. Finally, as the record shows, Morrison had three days in which to withdraw her consent to the agreement, which advised applicants that they may wish to consult an attorney before signing it.

## C. Cost-Splitting

Turning to the cost-splitting issue, we conclude that the district court erred in holding that the cost-splitting provision in the Circuit City arbitration agreement was enforceable. Under the standard articulated in section II.B., *supra*, we conclude that the cost-splitting provision in the Circuit City arbitration agreement would deter a substantial number of employees similarly situated to Morrison from seeking to vindicate their statutory claims and thus hold that it is unenforceable.

On appeal, Circuit City argues that Morrison could have avoided having to pay half of the cost of the arbitration, under the terms of Rule 13, if she could have arranged to pay the greater of $500 or three percent of her annual salary (in this case, three percent of $54,060, or $1,622) within ninety days of the arbitrator's award. Circuit City argues that, given this provision, we must reach the conclusion that Morrison did not face prohibitive costs in the present case because, at most, she would have been required to pay $1,622 for the arbitral forum.

In the abstract, this sum may not appear prohibitive, but it must be considered from the vantage point of the potential litigant in a case such as this. Recently terminated, the

potential litigant must continue to pay for housing, utilities, transportation, food, and the other necessities of life in contemporary society despite losing her primary, and most likely only, source of income. Unless she is exceedingly fortunate, the potential litigant will experience at least a brief period of unemployment. Turning to the arbitration agreement with her employer, the potential litigant finds that, as the default rule, she will be obligated to pay half the costs of any arbitration which she initiates.

Minimal research will reveal that the potential costs of arbitrating the dispute easily reach thousands, if not tens of thousands, of dollars, far exceeding the costs that a plaintiff would incur in court. Courts charge plaintiffs initial filing fees, but they do not charge extra for in-person hearings, discovery requests, routine motions, or written decisions, costs that are all common in the world of private arbitrators. Based on one recent study using costs and estimates provided by three major arbitration providers themselves, a plaintiff forced to arbitrate a typical $60,000 employment discrimination claim will incur costs, depending on which company is chosen to provide the arbitration, that range from three to nearly *fifty* times the basic costs of litigating in a judicial, rather than arbitral, forum. *See* Public Citizen, The Costs of Arbitration 40-42 (2002). Moreover, as the monetary stakes rise and more days of hearings are necessary, arbitration's relative cost increases. For an $80,000 claim — the largest claim that this study considered — the costs of arbitrating ranged from $4,350 to $11,625, *see id.* at 42; because Title VII allows compensatory damage awards up to $300,000, the costs of arbitrating will range higher and higher. Morrison cited a recent estimate by the AAA that the average arbitrator fee was $700 per day and that an average employment case incurred a total of $3,750 to $14,000 in arbitration expenses. Appellant's Br. at 13. Based on these considerations, along with the evidence that Morrison presented regarding her previous salary, we conclude that the default cost-splitting rule in the Circuit City arbitration