Kevin J. DeORNELLAS and Jay
B. Greve, Plaintiffs,

v.

ASPEN SQUARE MANAGEMENT,
INC., a Massachusetts domestic profit
Corporation; Harold Grinspoon; and
Johnson Real Estate Investors, d/b/a
Villages of Oscoda, Defendants.

No. 03–10147.

United States District Court,
E.D. Michigan,
Northern Division.

Dec. 4, 2003.

Kathleen L. Bogas, Eisenberg & Bogas, Bloomfield Hills, MI, for plaintiffs.

Theresa S. Lloyd, Thomas P. Vincent, Jeffrey C. Gerish, Plunkett & Cooney, Bloomfield Hills, MI, for defendants.

### ORDER GRANTING MOTION TO STAY PROCEEDINGS AND COMPEL ARBITRATION

LAWSON, District Judge.

The plaintiffs, Kevin J. DeOrnellas and Jay B. Greve, have sued the defendants claiming that they were wrongfully termi-

nated from employment in violation of various Michigan statutes. The defendants responded with a motion to compel arbitration and stay proceedings in this case, which the plaintiffs oppose. The Court heard the arguments of the parties through their respective counsel in open court on November 12, 2003. The Court permitted the parties to file supplemental briefs, which were received on November 21, 2003, and the matter is now ready for decision. The Court now finds that the plaintiffs signed employment documents in which they agreed to arbitrate their disputes with their employer, that the arbitration agreements are, for the most part, valid, and that the offending portions of the arbitration agreements can be severed. The Court will therefore sever the invalid provisions of the arbitration agreements and grant the motion to stay proceedings and compel arbitration.

## I.

DeOrnellas and Greve sued Aspen Square Management, Inc.(Aspen), Harold Grinspoon, and Johnson Real Estate Investors (Johnson), doing business as Villages of Oscoda, for wrongful termination. They claim that they were fired in retaliation for reporting environmental violations contrary to Michigan's Whistleblower's Protection Act (WPA), Mich. Comp. Laws § 15.361 *et seq.*, and for filing a claim under the Worker's Disability Compensation Act (WDCA), Mich. Comp. Laws § 418.101 *et seq.*

Villages of Oscoda is a former military base that is being converted into private residential housing. Aspen is the management company responsible for overseeing the project, and Johnson employs all employees performing work for Aspen on Villages of Oscoda. The plaintiffs were employed by Johnson as members of a construction crew renovating these military housing units on the former Wurtsmith Air Force Base to be sold to the public, although at the time the plaintiffs filed this action there apparently was some uncertainty as to the identity of their employer. The confusion was dispelled, and the Court dismissed Aspen Square Management, Inc. and Harold Grinspoon from the suit based upon a stipulation between the parties, leaving Johnson as the only defendant remaining in the case.

The plaintiffs each signed an employment arbitration agreement (Agreement). The Agreement signed by Mr. DeOrnellas provides as follows:

## EMPLOYMENT ARBITRATION AGREEMENT

In consideration of my employment by Johnson Real Estate Investors (the "Partnership"), I, Kevin DeOrnellas, agree with the Partnership as follows:

1. *The Partnership's Relationship with Employees:* Johnson Real Estate Investors is a general partnership that engages in the business of payroll processing.

2. *Arbitration of Disputes: I and the Partnership agree that any legal disputes that occur between myself and the Partnership which (a) arise out of or are related in any way to my employment with the Partnership, my performance of services under this Agreement, or the termination of this Agreement, (b) cannot be resolved informally, shall be resolved exclusively through final and private arbitration before the American Arbitration Association (the "AAA").* Any such arbitration shall be conducted in accordance with the AAA's rules governing the resolution of employment disputes, and *with the Partnership's Mandatory Dispute Resolution Policy, a copy of which I have received and reviewed. The Mandatory Dispute Resolution Policy is incorpo-*

*rated herein by reference.* The Partnership will designate the location of the AAA facility where the arbitration shall be held and will pay my travel expenses if I must travel more than two and one-half (2.5) hours from my home to reach the designated location. Otherwise, both the Partnership and I will pay our own costs and expenses of any arbitration.

I understand that I still have the right to file a charge against the Partnership with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Massachusetts Commission Against Discrimination, or any other state fair employment practice agency, and that any agency with which I file a charge may investigate that charge. I also understand that, notwithstanding my right to file a charge with an agency, I remain obligated to arbitrate any legal dispute with the Partnership. *Any claim I have against the Partnership for damages or other relief (whether or not related to any charge I file) will be arbitrated under this Agreement, and will not be adjudicated in court or by any agency.*

3. *Termination of Employment:* My employment may be terminated by the Partnership or myself at any time with or without cause.

4. *Entire Agreement:* This Agreement contains the entire and only agreement between me and the Partnership respecting the subject matter hereof, and no modification shall be binding upon me or the Partnership unless made in writing and signed by an authorized representative of the Partnership.

5. *Survival of Obligations:* My obligations under this Agreement shall survive the termination of my employment with the Partnership, regardless of the manner of or reasons for such termination, and regardless of whether such termination constitutes a breach of this Agreement or of any other agreement I may have with the Partnership. If any provisions of this Agreement or the Partnership's Mandatory Resolution Policy are unenforceable for any reason, the validity of any other provision hereof shall not be affected thereby.

6. *Governing Law: This Agreement shall be governed and construed according to the laws of the Commonwealth of Massachusetts, and shall be deemed to be effective as of the first day of my employment by the Partnership.* This Agreement is executed under seal.

BY PLACING MY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE READ ALL THE PROVISIONS OF THIS AGREEMENT AND THAT I AGREE TO ALL OF ITS TERMS.

Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 1, Employment Arbitration Agreements (emphasis added). The Mandatory Dispute Resolution Policy referenced in the Arbitration Agreement provides in relevant part as follows:

> Even in the best of companies, employees sometimes find themselves involved in legal disputes with their employer. If this happens at Johnson Real Estate Investors, we want the legal dispute resolved fairly, quickly, and without engaging in the costly and time-consuming process of civil litigation. That is why the Partnership has adopted a dispute resolution process for legal disputes that culminates in final and binding arbitration before a professional, neutral arbitrator.
>
> Arbitration is a method of dispute resolution strongly encouraged by both federal and state law. The United States Supreme Court has endorsed the use of arbitration to resolve individual employee disputes as fundamentally sound and fair. In arbitration, the parties to a

dispute appear before a trained, professional arbitrator who takes testimony under oath, listens to the parties' legal arguments, reviews any written submissions, and then renders a legally binding written decision. The process can be completed in a matter of a few months, as opposed to the years frequently consumed in litigating a case in court. The process affords both sides a full and fair opportunity to present witnesses and evidence under oath and to argue the law or the facts on their side to a skilled, neutral decision-maker. Many employers use arbitration as a means of resolving both commercial disputes and disputes with employees.

. . .

The arbitration provision contained in the Partnership's employment agreement applies only to certain "legal disputes" relating to the employment relationship between the Partnership and its employees. This kind of "legal dispute" means a claim by the employee that the Partnership breached a legal obligation to the employee by violating a statute, regulation, or common law obligation applicable in the employment relationship.

. . .

*The AAA fees for the arbitration, including the filing fee, any transcript fee, the arbitrator's fee, and the associated costs of the arbitration will be divided equally between the parties, except that (a) the Partnership may advance the employee's share of the fees if the employee is unable to pay the fees, and (b) if the arbitrator rules in the employee's favor, the arbitrator may require the Partnership to pay all of the costs of the arbitration other than legal fees.*

. . .

Any demand for arbitration filed more than six (6) months after the event or events giving rise to the legal dispute will be untimely. *The arbitrator is to apply federal law or Massachusetts substantive law in deciding the dispute.*

If the court should determine that any limitation or other provision of this policy is unlawful or would render the policy unenforceable, then the court should remove that limitation or provision and direct that the arbitration proceed.

The Mandatory Dispute Resolution Policy of Johnson Real Estate Investors, Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 3 (emphasis added).

On or about February 18, 2003, the plaintiffs were laid off. The plaintiffs, however, contend that the "lay off" was a pretext for a termination that was in fact made in retaliation for the plaintiffs having reported to authorities that the defendant was mishandling asbestos found at the job site, and having filed a worker's compensation claim. The plaintiffs contend that they learned that their employer was not complying with federal safety standards in the removal and disposal of asbestos from the renovated units. They alerted their supervisor to the problem, but the faulty practices persisted. The plaintiffs allege that they subsequently reported the violations to the Michigan Department of Environmental Quality, which later initiated an investigation. During this time, plaintiff DeOrnellas suffered a back injury and filed a worker's compensation claim. The defendant was aware of the plaintiffs' initial report regarding environmental problems. Following a second report, the plaintiffs were laid off. The defendants deny any wrongdoing and contend that the action was simply a work-reduction motivated lay-off.

The plaintiffs filed the present action in the Iosco County, Michigan Circuit Court in May 2003. The defendants removed the case to this Court on diversity grounds. The defendants then filed the present mo-

tion to stay proceedings and compel arbitration.

## II.

The plaintiffs argue that the arbitration agreements in this case should not be enforced because they are substantively flawed since the choice of law provisions deprive the plaintiffs of the substantive rights afforded under the WPA; and they are procedurally defective because they do not provide the plaintiffs with clear notice that they were waiving the right to proceed in a judicial forum, and they potentially expose the plaintiffs to prohibitive costs by requiring sharing expenses and conducting the proceedings possibly in a remote location, which effectively deprives the plaintiffs of a forum for vindication of their rights. The defendant responds that the law of Massachusetts, which is chosen as the rule of decision in the Agreement, is not so substantively different from Michigan law as to create a material deprivation of rights; the arbitration agreement includes a safety valve that may provide the plaintiffs relief from the cost-sharing and location burdens imposed; and even if those provisions are offensive, they can be severed.

 The present motion requires the Court to apply the Federal Arbitration Act (FAA). That legislation was enacted in 1925, and then was reenacted and codified as Title 9 of the United States Code in 1947. *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 288, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002). Congress' purpose in enacting the FAA "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Ibid.* (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). The Act states that every written provision in a contract "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Employment contracts, except those covering workers engaged in transportation, are also governed by the Act. *EEOC,* 534 U.S. at 289, 122 S.Ct. 754 (citing *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)).

The FAA requires a federal court to stay an action when an issue in the proceeding is referable to arbitration, *see* 9 U.S.C. § 3, and to compel arbitration when one party fails or refuses to comply with the provisions of an enforceable arbitration agreement. *See* 9 U.S.C. § 4; *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.,* 350 F.3d 568, 572–73 (6th Cir.2003) (observing that "any doubts regarding arbitrability must be resolved in favor of arbitration"). Supreme Court cases have found that these provisions "manifest a 'liberal federal policy favoring arbitration agreements.' " *EEOC,* 534 U.S. at 289, 122 S.Ct. 754.

 This does not mean, however, that a federal court faced with an arbitration provision must find that it always governs the resolution of a dispute between parties or applies to the claims that they present. The language of the contract defines the scope of disputes subject to arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (stating that "the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties"). The language of the FAA and public policy operate in some cases to render an arbitration agreement unenforceable. *See Circuit City,* 532 U.S. at 115, 121 S.Ct. 1302 (finding that

the FAA does not allow arbitration of employment disputes involving transportation workers); *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (observing that language in arbitration agreements that effectively deprives a claimant of statutory remedies violates public policy and is unenforceable). Resolution of these questions requires resort to both federal and state law. "In determining whether the parties have made a valid arbitration agreement, 'state law may be applied *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally,' although the FAA preempts 'state laws applicable *only* to arbitration provisions.'" *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir.2002) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)). "[S]tate law governs 'generally applicable contract defenses [to an arbitration clause], such as fraud, duress, or unconscionability.'" *Id.* at 889 (quoting *Casarotto*, 517 U.S. at 687, 116 S.Ct. 1652).

### A.

■ The plaintiffs' substantive challenge to the arbitration agreements is focused on the combined effect of the forum selection and choice-of-law provisions of the Mandatory Dispute Resolution Policy, which is incorporated into the arbitration agreements. The plaintiffs state that there is no statutory cause of action in Massachusetts that corresponds to Michigan's WPA, and that the plaintiff cannot recover attorney's fees under a concomitant common-law claim in Massachusetts.

The Supreme Court has consistently held that an agreement to arbitrate is an agreement to choose a specific forum for the resolution of disputes that may arise under a contract; it is not a limitation on substantive rights. Thus, when an arbitration agreement can fairly be read to include a statutory claim, the Supreme Court has "recognized that '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" *Gilmer*, 500 U.S. at 26, 111 S.Ct. 1647 (1991) (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S.Ct. 3346). *See also Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 670 (6th Cir. 2003) (en banc) (holding limitation-of-remedies provision of arbitration agreement unenforceable because it undermined the remedial purposes of Title VII).

The arbitration agreement in this case does not contain any limiting language that precludes the plaintiffs from raising claims against their employer under the WPA. However, the plaintiffs fear that the choice-of-law provision in the Mandatory Dispute Resolution Policy stating that the arbitrator must apply federal law or Massachusetts law may operate to deny them the remedies afforded under the Michigan statute. If that were the inevitable result, the arbitration agreement likely would violate public policy and would be unenforceable. *See Mitsubishi Motors Corp.*, 473 U.S. at 637 n. 19, 105 S.Ct. 3346 (observing that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies ... we would have little hesitation in condemning the agreement as against public policy").

■ It is not clear at this stage of the proceedings, however, that the choice-of-law provision of the Mandatory Dispute Resolution Policy would be enforced. The arbitration agreement itself requires the contract to be construed under Massachusetts law, but that does not require the arbitrator to ignore a statutory cause of action that arises in the state where the employment occurred. Although the par-

ties agreed that Massachusetts law would be used to construe the terms of the contract, it does not follow that it is the sole source for the rules of decision for disputes that arise out of the employment relationship, especially when the denial of the right to pursue a statutory claim would result. Under Massachusetts law, a choice-of-law provision may be disregarded if it violates public policy. *See Northeast Data Sys. v. McDonnell Douglas Computer Sys.*, 986 F.2d 607, 610 (1st Cir.1993).

When confronted with uncertainty as to the law the arbitrators may apply, the Supreme Court has counseled that the proper course is to compel arbitration, and address the issues relating to the abrogation of substantive rights on judicial review of the arbitration award, when the need to speculate on the arbitrator's choice of law has passed. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). In *PacifiCare*, the Supreme Court reversed the decision of a lower court that refused to compel arbitration of disputes between physicians' groups and managed care organizations, which included claims based on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* The contract that contained the arbitration clause included language prohibiting the award of punitive damages, and since treble damages are available under RICO, the lower court held the arbitration agreement unenforceable because it prevented the plaintiffs from obtaining "meaningful relief." The Supreme Court observed that whether RICO's treble damage provision is properly characterized as "punitive" is open to debate, and the ambiguity ought not be resolved by the court in the context of determining whether the arbitration clause is enforceable. Thus, the Court concluded, "since we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreement unenforceable and whether it is for courts or arbitrators to decide unenforceability in the first instance are usually abstract." *PacifiCare*, 123 S.Ct. at 1536. The Court held, therefore, that "the proper course is to compel arbitration." *Ibid.*

The *PacifiCare* Court placed great reliance on *Vimar*, where the Court was asked to enforce an arbitration clause in a bill of lading in the context of a dispute over goods damaged by a shipper. The agreement provided that any disputes arising out of the shipping agreement would be governed by Japanese law and resolved through arbitration before the Tokyo Maritime Arbitration Commission. Vimar argued that the arbitration clause was unenforceable because it violated federal policy found in the Carriage of Goods Sea Act (COGSA), 46 U.S.C.A. § 1300 *et seq.* Since there was no guarantee foreign arbitrators would apply COGSA, Vimar feared that the arbitrator was likely to apply rules of Japanese law, under which the defendant's liability would be less than what it would be under COGSA, and this would violate the central guarantees of COGSA. Rejecting that argument, the Court held that the arbitration provision was at least initially enforceable. *Vimar*, 515 U.S. at 540–41, 115 S.Ct. 2322. The Court explained, "[a]t this interlocutory stage it is not established what law the arbitrators will apply to the petitioner's claims or that petitioner will receive diminished protection as a result. The arbitrators may conclude that COGSA applies of its own force or that Japanese law does not apply so that, under another clause of the bill of lading, COGSA controls.... [M]ere speculation that the foreign arbitrators might apply Japanese law which, depending on the proper construction of COGSA, might reduce respondents' legal obligations does not in and of itself lessen

liability under COGSA § 3(8)[,]" nor did it provide an adequate basis to conclude that the arbitration provision was unenforceable. *Ibid.* The Court noted that the district court should have reserved judgment on the choice-of-law provision, since it must be decided in the first instance by the arbitrator. *Ibid.* Significantly, the Court observed that "[t]he District Court has retained jurisdiction over the case and 'will have the opportunity at the award-enforcement stage to ensure that the legitimate interest in the enforcement of the . . . laws has been addressed.'" *Ibid.*

Likewise, this Court concludes that the strong policy favoring arbitration requires that the question of the proper law to apply should be decided by the arbitrator in the first instance. The mere possibility that an arbitrator may apply Massachusetts common law or construe it in such a manner that the plaintiffs' rights might be less than allowed under Michigan's WPA is not sufficient to render the arbitration agreement unenforceable.

 The plaintiff also complains that the remedial provisions of the WPA will be compromised under Massachusetts law because there is no statutory right to attorney fees. Indeed, the WPA contains a remedial section that states:

> A court, in rendering a judgment in an action brought pursuant to this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, or any combination of these remedies. A court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate.

Mich. Comp. Laws § 15.364.

The defendant argues that a close analysis of the two states' laws reveals little difference between the two since Michigan's WPA does not automatically entitle the plaintiffs to attorney's fees and Massachusetts common law allows for an award of attorney's fees in some instances. *See Bournewood Hosp., Inc. v. Massachusetts Comm'n Against Discrimination,* 371 Mass. 303, 312, 358 N.E.2d 235, 240 (1976) (noting that "courts of equity, in certain cases under their general powers, allow counsel fees"). The defendant's argument ignores the explicit language of the Mandatory Dispute Resolution Policy, however, which states that "if the arbitrator rules in the employee's favor, the arbitrator may require the Partnership to pay all of the costs of the arbitration *other than legal fees.*" Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 3 (emphasis added). This provision eliminates the ambiguity from the issue of whether the arbitrators remedial powers extend to an award of attorney's fees, even if the plaintiffs prevail on the merits, and regardless of what law is applied.

 When confronted with a similar challenge to an arbitration agreement, the Sixth Circuit held that the limitation-on-remedies provision was unenforceable. *See Morrison,* 317 F.3d at 673. The question that then arose was whether the offending language could be severed from the agreement, an issue that must be decided under state contract law. *Id.* at 674–75. In this case, Massachusetts law states that the severability of a contractual provision depends upon the intent of the contracting parties. *Carrig v. Gilbert–Varker Corp.,* 314 Mass. 351, 358, 50 N.E.2d 59, 63 (1943) (stating that "[w]hether a contract is entire or divisible depends upon the intention of the parties as disclosed by the language of the contract, the manner in which it is to be performed, the method of payment, and the circumstances attending its execution and operation"); *Barlow Mfg.*

*Co. v. Stone,* 200 Mass. 158, 86 N.E. 306 (1908). *See also Cadillac Auto. Co. of Boston v. Engeian,* 339 Mass. 26, 30, 157 N.E.2d 657, 660 (1959) (noting that "it is well settled that if the part of a contract which is valid, can be separated from that which is void, and carried into effect, it may be done") (internal quote and citation omitted). The arbitration agreement in this case specifically declares that "[i]f any provisions of this Agreement or the Partnership's Mandatory Resolution Policy are unenforceable for any reason, the validity of any other provision hereof shall not be affected thereby." Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 1. The court observed in *Morrison* that "when the arbitration agreement at issue includes a severability provision, courts should not lightly conclude that a particular provision of an arbitration agreement taints the entire agreement." *Morrison,* 317 F.3d at 675 (citing *Great Earth Cos. v. Simons,* 288 F.3d 878, 890–91 (6th Cir.2002)).

Following this precedent, this Court concludes that the language in the arbitration agreement and the Mandatory Dispute Resolution Policy that restricts the arbitrator from awarding attorney's fees to the plaintiffs, as allowed by the WPA, is unenforceable, and it shall be severed from the arbitration documents and disregarded by the arbitrator.

### B.

The plaintiffs also complain that the arbitration agreements fail to adequately notify employees that they are foregoing their right to a jury trial in a court, and that they are procedurally unfair because of the opportunity to impose burdensome cost-sharing and location conditions on claimants. These features will deter litigants from arbitrating claims, the plaintiffs insist, and render arbitration an ineffective substitute for a judicial forum.

### 1.

Plaintiff Kevin DeOrnellas has filed an affidavit in which he avers: "I do not specifically recall signing an 'Employment Arbitration Agreement', but I know that I was not given a copy of the 'Partnership's Mandatory Dispute Resolution Policy' nor did I review any such policy." *See* Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 2, Aff. of Kevin DeOrnellas at ¶ 5. He also states that the defendants' method of presenting documents for signature was by "either posting them at the time clock for our signatures when we punched in or out for work, or by passing around a clipboard at occasional brief safety meetings." *Id.* at ¶ 3. In addition, the plaintiffs argue that by not using common terms such as "trial" and "jury," the arbitration agreement does not provide clear notice that the employee is surrendering the right to a jury trial in court.

In *Haskins v. Prudential Ins. Co. of America,* 230 F.3d 231, 239 (6th Cir.2000), the court of appeals adopted a rigid standard governing the enforcement of arbitration clauses against claims by parties such as employees of ignorance of the import or significance of the documents they actually signed. The court relied on precepts of contract law and endorsed the concept that "one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party. Thus, ignorance of the contents of a contract expressed in a written instrument does not ordinarily affect the liability of one who signs it or who accepts it otherwise than by signing it." *Id.* at 239 (quoting 17A Am.Jur.2d Contracts § 224 (1991)). In that case, the court enforced an agreement to arbitrate that incorporated by reference another document, which contained a description of the issues sub-

ject to arbitration. The evidence showed that the plaintiff never received the other document, nor did his employer explain the arbitration clause to him.

The Sixth Circuit has subsequently limited the precedential effect of *Haskins* to the extent that it may be cited for the proposition that it precludes an inquiry into the fairness of the arbitration process. *See McMullen v. Meijer, Inc.*, 337 F.3d 697, 702–03 (6th Cir.2003) (explaining that a broad reading of *Haskins* to prevent an inquiry into the fairness of the selection process of arbitrators or the adequacy of the arbitral forum to afford complete relief was "superseded by our en banc decision in *Morrison v. Circuit City Stores, Inc.*"). Nonetheless, left intact was "the *Haskins* court adopt[ion of] a contracts-law approach to determining the validity of the agreement, holding that, despite plaintiff's ignorance, the agreement was enforceable absent fraud, mistake, duress, or another contractual ground for challenge." *McMullen*, 337 F.3d at 702.

 This approach is consistent with other Sixth Circuit precedent. Parties are not excused from an arbitration provision just because it appears in a separate document from the rest of the contract. *See Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1016 (6th Cir. 2003) (noting general contract principle that "[w]hen documents are incorporated by reference into a document, they are to be read as though they are restated in the contract"); *Haskins*, 230 F.3d at 239, 241 (incorporating, by reference, the rules of the National Association of Securities Dealers). The cases establish the general rule that " 'one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions.' " *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir.2000) (citing *Allied Steel & Conveyors, Inc. v. Ford Motor Co.*, 277 F.2d 907, 913 (6th Cir.1960)), *cert. denied*, 531

U.S. 1148, 121 S.Ct. 1088, 148 L.Ed.2d 963 (2001); *See also Rowady v. K Mart Corp.*, 170 Mich.App. 54, 428 N.W.2d 22 (1988); *Gardner v. Johnson*, 236 Mich. 258, 210 N.W. 295 (1926).

In this case, although the plaintiffs claim that they do not remember signing the Agreement and state that they never saw the Mandatory Dispute Resolution Policy, they concede that their signatures appear on the Agreements proffered by the defendants. The Agreement contains language in Paragraph 2 in twelve-point type that states: "Any claim I have against the Partnership for damages or other relief (whether or not related to any charge I file) will be arbitrated under this Agreement, and will not be adjudicated in court or by any agency." Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 1. Appearing immediately above their respective signatures is the legend in bold-face type that reads: "BY PLACING MY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE READ ALL THE PROVISIONS OF THIS AGREEMENT AND THAT I AGREE TO ALL OF ITS TERMS." *Ibid.*

The Court finds that the plaintiffs entered into an agreement to arbitrate their claims, under the governing rules of contract law. They do not deny that their signatures appear on the Agreements, nor do they allege fraud, mistake, or duress. The agreement provides adequate notice of the nature of the alternate forum, specifically that their disputes will not be decided in court. The Court concludes that the agreement is a valid waiver of the right to pursue claims in court.

2.

 The provisions of the Mandatory Dispute Resolution Policy referenced in the Agreement relating to the location of the arbitration hearing and the allocation of costs do not pass the test established in

*Morrison.* Arbitration of statutory claims must be accessible to potential litigants as well as adequate to protect the rights in question so that arbitration, much like judicial resolution of disputes, will "further broader social purposes." *Morrison,* 317 F.3d at 658 (quotation and citation omitted). "To put the matter in a slightly different way, employers should not be permitted to draft arbitration agreements that deter a substantial number of potential litigants from seeking any forum for the vindication of their rights." *Ibid.* Oppressive cost-sharing provisions may not be enforced. Thus, according to the *Morrison* court, "[if] ... the splitting or sharing of the costs of the arbitral forum under a particular arbitration agreement effectively prevents the vindication of a plaintiff's statutory rights, those rights cannot be subject to mandatory arbitration under that agreement." *Ibid.*

The *Morrison* court directs the district court to assess cost-sharing provisions in light of the means of litigants to comply with them. This analysis requires the court first to "define the class of such similarly situated potential litigants by job description and socioeconomic background." *Id.* at 663. The economic wherewithal of this class of litigants should be appraised against the "average or typical arbitration costs," while also considering "the costs of litigation as the alternative to arbitration." *Id.* at 664. These factors must be taken into account when deciding the ultimate issue: "Reviewing courts must consider whether the litigant will incur this additional expense and whether that expense, taken together with the other costs and expenses of the differing fora, would deter potential litigants from bringing their statutory claims in the arbitral forum." *Ibid.* The reviewing court also must consider the ameliorative effect of cost-sharing provisions that unburden successful litigants. The *Morrison* court predicted, however, that the viability of cost-sharing provisions would turn largely on the economic status of the employee: "[I]n many cases, ... high-level managerial employees and others with substantial means can afford the costs of arbitration, thus making cost-splitting provisions in such cases enforceable. In the case of other employees, however, this standard will render cost-splitting provisions unenforceable in many, if not most, cases." *Id.* at 665 (citation omitted).

So it is in this case. The only evidence before the Court indicates that Kevin DeOrnellas is an hourly worker who is solely responsible for the support of his wife and children. Judging by the nature of his claim, he represents a class of hourly workers who may have been exposed to asbestos during the renovation of a decommissioned military base. He is not a high-level managerial employee, and he has averred that arbitration fees and potential expenses for travel to a remote location to arbitrate his claim would be unduly burdensome. He asserts that, if he knew that he would be saddled with these expenses, he "would not have attempted to bring [his] claims under the above circumstances because to do so would be an undue financial burden as well as a hardship on [his] family." Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 2, Aff. of Kevin DeOrnellas at ¶ 10.

The expense of arbitrators' fees are costs that a litigant would never be required to bear in a judicial forum. "Courts charge plaintiffs initial filing fees, but they do not charge extra for in-person hearings, discovery requests, routine motions, or written decisions, costs that are all common in the world of private arbitrators." *Morrison,* 317 F.3d at 669. Moreover, Mr. DeOrnellas is not employed. The statement of Mr. DeOrnellas that the cost-sharing provision would act as a deterrent to the pursuit of his reme-

dies convinces the Court that the cost-sharing provision of the Mandatory Dispute Resolution Policy cannot be enforced against the class of potential litigants to which the plaintiffs belong.

The venue provision of the Agreement is likewise unfair. It states that "[t]he Partnership will designate the location of the AAA facility where the arbitration shall be held and will pay my travel expenses if I must travel more than two and one-half (2.5) hours from my home to reach the designated location. Otherwise, both the Partnership and I will pay our own costs and expenses of any arbitration." Pls.' Resp. in Opp. to Def.'s Mot. to Compel Arb. Ex. 1. This provision allows the defendant to remove the proceedings to a location that could prohibit the effective adjudication of the claim in an arbitral forum. Although there is a provision for reimbursement of travel expenses, it applies only to the claimant and does not cover the expenses of travel for others whose presence may be necessary for the presentation of claims, such as attorneys and witnesses, nor does it cover lodging for anyone. The AAA is a national organization with arbitration facilities across the country. There is no limitation to the venue that could be selected solely by the defendant. It is a provision that could place the plaintiffs at great disadvantage and may prevent the vindication of the plaintiffs' rights.

The Court finds that the cost-sharing and venue provisions of the arbitration documents in this case are unenforceable. As with the limitation of remedies provisions, however, these provisions are severable, and they will not invalidate the core provisions of the Agreement. As *Morrison* teaches, therefore, the Court will sever the offending provisions and enforce the Agreement to arbitrate.

## III.

The Court finds that the portions of the arbitration documents in this Agreement that limit remedies, allow for the sharing of costs, and permit the defendant to select the location of the arbitration hearing, are invalid and unenforceable. They are, however, severable, and once severed, they no longer infect the agreement to arbitrate. The provisions of the FAA, therefore, require this matter to be decided in arbitration.

Accordingly, it is **ORDERED** that the defendant's motion to compel arbitration [dkt # 7] is **GRANTED**.

It is further **ORDERED** that the provisions of the arbitration agreements and the Mandatory Dispute Resolution Policy relating to cost-sharing and location of the proceedings are severed from the agreements and declared unenforceable.

It is further **ORDERED** that the matter in this Court is **STAYED** pending the completion of the arbitration proceedings before the American Arbitration Association.

It is further **ORDERED** that the defendant shall promptly file a demand for arbitration and pay the fees required to cause this matter to proceed to arbitration before the American Arbitration Association at its hearing facilities in Southfield, Michigan, or such other location to which the plaintiffs may agree, and in accordance with the American Arbitration Association rules applicable to such disputes.

It is further **ORDERED** that the Court shall retain jurisdiction to review and enforce or vacate, as appropriate, any arbitral award; however the matter shall be **ADMINISTRATIVELY CLOSED** for statistical purposes until such time as a

party shall apply to this Court for further relief.